No. 28,771.

BERTHA GOLDEN, *Appellant* and *Cross Appellee*, v. WILSON AND COMPANY, *Appellee* and *Cross Appellant*.

(281 Pac. 860.)

Opinion filed November 9, 1929.

*James L. Hogin,* of Kansas City, and *James G. Smith,* of Kansas City, Mo., for the appellant and cross appellee.

*Arthur J. Stanley, Arthur J. Stanley, Jr.,* both of Kansas City, and *A. K. Gembick,* of Chicago, Ill., for the appellee and cross appellant.

The opinion of the court was delivered by

BURCH, J.: The action was one by the widow of a deceased employee for compensation. She recovered, but appeals from the judgment on the ground the degree of her dependency was not correctly determined, and consequently the amount of compensation allowed was too small. The employer notes a cross appeal on two grounds: First, that the employee's death was not the result of accidental injury; and second, that certain important evidence offered by plaintiff was improperly received. These objections to the judgment will be considered in reverse order.

The employee, Elihu Golden, was injured on January 5, 1926, by a fall which caused a pain in the upper part of his back. He continued to suffer pain there, was obliged to quit work, and entered Bell Memorial hospital as a charity patient. An X-ray examination disclosed that the transverse portion of a dorsal vertebra had

broken down until it was about one-third normal thickness. On April 3, 1926, the Albee spinal graft was performed, bone for the purpose being taken from the tibia. The expectation was that the bone graft would grow in place and enable the weakened vertebra properly to perform its function. Golden remained in the hospital for about two months, and was never able afterward to resume his employment or to do other work. On April 5, 1927, he died in Wheatly hospital, of thrombosis, a sort of exaggerated embolism. After death his body was removed to an undertaking establishment, where an autopsy was held. Dr. B. M. Colby, a physician specializing in pathology and diagnosis and a laboratory director of the American Biochemical laboratory, assisted at the autopsy. It was found the bone graft was mostly absorbed and was holding well, but a pus pocket had formed there which contained a quantity of pus, and exploration disclosed the pus was coming from the bony structure. Examination of the heart disclosed it was enlarged, the pericardium was thickened and was distended by a quantity of fluid, and the mitral valve showed vegetative growths on each cusp. A blood clot the size of an egg was found in the brain. The clot was surrounded by mushy brain tissue, and a smaller clot also surrounded by degenerated tissue was found in the right parietal region. Doctor Colby took specimens from the spine abscess, from the vegetative growths on the heart valve, and from the brain substance surrounding the clots. Microscopical examination and culture made from the specimens revealed staphylococcus aureus.

Plaintiff's theory was that the injury established a focus or feeding ground for the staphylococcus organisms, and the organisms were disseminated from the spinal pus pocket to the heart and to the brain. An alternative theory was that if a focus existed at the time of injury, it did not impair the workman's efficiency, and the injury aggravated the conditions and caused the staphylococcus organisms to be disseminated from the diseased vertebra to the heart and to the brain, by the blood stream. In either event death resulted from the injury.

Doctor Colby was called as a witness for plaintiff. He told what was done and what was found at the autopsy, and told what he did by way of identification of the staphylococcus aureus organisms in the specimens he took. On the fact foundation thus established expert testimony was given supporting plaintiff's theory that Golden's death resulted from the injury he sustained in January, 1926.

Defendant objected to Doctor Colby's testimony on the ground the doctor was not a competent witness. Disqualification was predicated on the provisions of R. S. 44-515, 44-516 and 44-517. The contention was defendant was not given reasonable opportunity to have a physician present at the autopsy.

It is not necessary to print the sections of the statute here. R. S. 44-515 relates to examination of an injured employee by a physician on request of the employer, and to right of the employee to have a physician of his own selection present at the examination. The section also provides that "either party" may, on demand and on payment of a fee, require report of any examination made by a physician selected by the "other party." The context shows the terms "either party" and "other party" refer to employee and employer and to examination during pendency of the employee's claim for compensation, and during receipt by the employee of payments under the compensation act.

R. S. 44-516 contemplates existence of a proceeding for compensation pending before an arbitrator or court, and authorizes the arbitrator or court to employ at the expense of the parties a neutral physician to examine the injured person. Appointment of a neutral physician is made in response to a petition for his appointment. While the statute authorizes petition by employer, employee, or both, or dependents, it relates to examination of the injured workman as a person.

R. S. 44-517 relates to examination of the employee by a physician or surgeon selected by employer or by employee, and disqualifies the physician selected by either employer or employee, as a witness, unless the other had reasonable opportunity to have his physician present. The examination referred to is an examination by "either party" under the provisions of R. S. 44-515.

The result of the foregoing is that the statute does not in terms apply to an autopsy, and this court interprets disqualifying statutes strictly. The statute does not, even by implication, apply to an autopsy when no proceeding for compensation is pending between a dependent and the employer. In no event could the statute apply to the autopsy which became material in this case.

Dr. Don Carlos Peete, an interne and the house doctor in surgery, took care of Golden while he was in Bell Memorial hospital. As indicated, Golden died nearly a year later in Wheatly hospital. The widow neither proposed nor arranged for the autopsy. Doctor

Peete testified that through the hospital he asked the widow for her signature to permit an autopsy, and secured her signature.

Before his death, Golden had sued his employer for compensation. Early in the morning of the day Golden died, James G. Smith, one of Golden's attorneys, went to Wheatly hospital for information because the case was coming on for trial. Smith was informed that Golden was dying or had just died, and learned an autopsy was to be held. Smith secured attendance of Doctor Colby at the autopsy, held about noon of the same day. Smith was afterward employed by the widow.

Under the circumstances stated, the widow was neither party nor privy to the post-mortem examination. She rested under no statutory duty to notify defendant of the contemplated autopsy, and Doctor Colby was a competent witness at the trial of the widow's case.

The court found that Golden's death resulted from the injury he received on January 5, 1926. Defendant contests the finding as unsupported by evidence. It would serve no useful purpose to discuss the evidence in detail. The court holds the finding was not the result of speculation or conjecture, and that it expressed an inference of fact based on substantial evidence warranting the inference.

The court stated the following findings of fact:

"3. That plaintiff's husband, Elihu Golden, had been in the employ of the defendant for more than fifty-two weeks prior to January 5, 1926, and had an average earning for said year of $20 per week. . . .

"6. That at the time plaintiff's husband sustained said injury plaintiff was employed and had been employed prior to said time, earning $10 per week, and that the $20 earnings of plaintiff's husband and her $10, or a total of $30, was used for both of them to maintain themselves.

"7. That plaintiff is the sole and only dependent of Elihu Golden, deceased, and was only partially dependent upon him for support. . . .

"9. That her degree of dependency on her husband, Elihu Golden, was one-sixth, or sixteen and two-thirds per cent, and that she is entitled to have and recover a judgment against the defendant in the sum of $520 and costs."

As applied to this case, the statute provides that the compensation to a widow, sole dependent and wholly dependent, shall be a sum equal to three times the workman's average yearly earnings. If she was only partially dependent, she shall receive such part of the sum mentioned as is proportionate to her degree of dependency. (R. S. 44-510.)

In the opinion in the case of *McCormick et al. v. Coal & Coke Co.*, 117 Kan. 686, 232 Pac. 1071, this court said:

"A surviving spouse may be wholly dependent, or may have employment, or a separate income, or be living apart from the workman, so as to be only partially dependent, or not dependent at all . . . Wholly dependent means full, complete dependence, that the individual has no consequential source or means of maintenance other than the earnings of the workman. Partial dependence may vary in degree from wholly dependent on the one hand to wholly independent on the other." (p. 690.)

In this instance the dependent's contribution to the joint maintenance fund constituted one-third of the whole, and must be regarded as substantial.

If the district court assumed that the individual drafts of husband and wife on the joint maintenance fund were equal in amount, the husband contributed $5 a week to his wife's maintenance, or twenty-five per cent of his earnings, and she was certainly dependent on him to that degree. We are not concerned, however, with how the domestic economies of husband and wife might have been arranged, but with how they were arranged (*Fennimore v. Coal Co.*, 100 Kan. 372, 375, 164 Pac. 265); and according to the testimony of the widow, they were arranged in this way:

"I started to work for the Frederick hotel about five years ago. I worked there at the time my husband was in the hospital. Had worked there four or five years as a maid and received $10 per week. I received $10 a week for my work all the time. Mr. Golden earned money, and the two of us put our money together for the expenses of the home. We didn't keep any maid in the home. I did my own work. My husband was earning a wage of $20, and I was earning $10, and it took it to keep us."

The result is, husband and wife were mutually dependent on each other to the extent of their earnings, and since her contribution to the joint fund was one-third and his contribution was two-thirds, the degree of her dependency was sixty-six and two-thirds (66⅔) per cent.

Suppose the wife earned twenty dollars per week, the husband earned twenty dollars per week, and it took the forty dollars for them to live. It cannot be said the wife would not be dependent on her husband in any degree, and because the necessities of life would be provided, one-half by her and one-half by her husband, the degree of her dependency would be fifty per cent. This is so because in computing degree of dependency the portion of the husband's wages conceived as consumed, or in the fact consumed, in his individual

support, may not be deducted from his contribution to the joint fund. (*Slater v. Milling Co.*, 106 Kan. 772, 189 Pac. 908.)

In the Slater case a father and minor son each earned $17.45 per week. The son gave all his earnings to his father, and the joint earnings were used by the father to support his family. The father gave the son small sums of spending money, and the district court found the fair cost of the son's board and maintenance, including spending money, was $5 per week. The son was killed by accident, and this court held the father and mother were dependent on the son to the full amount of his wages. In the opinion the court said:

"The question is not free from difficulty. There is, however, no provision in the statute that in case of the death of a workman the cost and expense incurred in his board and support during his lifetime shall be taken into consideration for any purpose. . . . It is argued with much force, too, that there is no more reason for deducting the living expenses of a minor than there would be to make such a deduction from the earnings of the father in case of his death. There being no express provision in the statute, it must be held that in ascertaining the average yearly earnings of the minor, and in fixing the degree of dependency of the parents, the employer is not entitled to a credit or deduction for the expense of the minor's [workman's] board and support." (p. 774.)

The judgment of the district court is set aside. The finding that the degree of plaintiff's dependency was sixteen and two-thirds per cent is modified to read sixty-six and two-thirds per cent, and the cause is remanded to the district court for judgment accordingly.