IN THE MATTER OF THE PETITION OF SHEFFIELD FARMS COMPANY, INC., A CORPORATION OF THE STATE OF NEW YORK, LICENSED TO DO BUSINESS IN THE STATE OF NEW JERSEY, TO DISINTER THE BODY OF THOMAS McDONOUGH FOR THE PURPOSE OF AUTOPSY.

SHEFFIELD FARMS COMPANY, INC., PETITIONER-APPEL-LANT, v. ANNA McDONOUGH, WIDOW OF THOMAS McDONOUGH, DEFENDANT-RESPONDENT.

Argued October 15, 1956—Decided November 19, 1956.

Mr. *Joseph C. Paul* argued the cause for the appellant (*Mr. Henry M. Grosman*, attorney).

Mr. *Perry E. Belfatto* argued the cause for the respondent.

The opinion of the court was delivered by

VANDERBILT, C. J. The question presented by this appeal is whether an employer, ten months after the burial of an employee who died in the course of his employment, may obtain the disinterment of that employee's body and an autopsy to determine the cause of death for the purpose of defending a claim by the workman's widow that she is entitled to be compensated for the incident. From the order of the Law Division of the Superior Court denying the application, the employer appealed to the Appellate Division and we certified the matter on our own motion.

Thomas McDonough, the deceased employee, was a route salesman for the Sheffield Farms Company, Inc. On July 5, 1955, he started work at his usual hour, 4 A. M., and after satisfying the demands of his route, he returned to the milk plant at about 2:30 P. M. to work on his records. It was one of the hottest days of the uncomfortable summer of 1955. The temperature was at or near the maximum for the day of 99 degrees. At about 3:30 P. M. he collapsed, was taken to the hospital and there died at about 6 P. M. The hospital records show that on admission the decedent was in a coma, completely flaccid, his skin was hot and dry to the touch and his face was livid. Just prior to his death he had a temperature of 110 degrees. The report of death gives as the immediate cause "cerebral thrombosis with possible concomitant heat stroke."

Almost ten months after his death his employer sought to have McDonough's body exhumed and an autopsy performed, relying for its action solely on *N. J. S. A.* 40:21–30.11 and *N. J. S. A.* 40:21–71. Attached to the employer's moving papers was a supporting affidavit of Dr. Asher Yaguda, a pathologist and internist, who was specially retained by it to examine the records in connection with the death of Thomas McDonough. He swears that he has been unable "to ascertain the exact cause of death * * *" but that in his opinion "if the body of the deceased * * * was disinterred and an autopsy performed, the exact cause of death would be determined."

In opposition, the defendant widow submitted the affidavit of Dr. Arthur Bernstein, a specialist in the diagnosis and treatment of cardiovascular diseases. Dr. Bernstein, like Dr. Yaguda, examined and reviewed the hospital and other records in connection with the death of the decedent and on the basis of that information it was his "medical opinion that this man suffered a heat stroke causing high fever, that the patient's heart went into failure and that he died as a result of heart failure combined with cerebral manifestations of a heat stroke." It was his further opinion "that the cause of death is easily ascertainable within reasonable medical probability from all facts and information at hand, which facts and information are either in the possession of or available to the petitioner in these proceedings. * * *" He further stated, significantly, that "an autopsy to be performed at this date, 10 months after death and interment, and after embalming, would not show the cause of death of this decedent and would serve no useful purpose."

*N. J. S. A.* 40:21–30.11 and 40:21–71, the two statutes relied upon by the employer, are identical and provide:

"In any county having a chief medical examiner, the Superior Court or the County Court may, upon application and without notice, order the disinterment of any body under the direction and supervision of the chief medical examiner, and authorize the removal by the chief medical examiner of the body to the public morgue for the purpose of examination or autopsy."

The employer's contention here is that since there is no definite and conclusive knowledge as to exactly what the defendant died of—either heat stroke or heart failure—it had a right to know, and if it could be determined by autopsy, then an autopsy should be permitted. The employer says that "to prove decedent died of heart failure, a more difficult line of proof would be required than if he died of a heat stroke"; that "in view of the history of a previous heart disease, probably rheumatic, it is just as likely that the employee died as a result of that as well as a heat stroke," and that it should not be required to guess the cause of death.

The decedent's widow urges that the statutes upon which

the employer relies are statutes enacted under the police power and not authority for the exhumation in this case, and also that even apart from the statute the plaintiff has failed to establish facts necessary for the granting of such relief.

■ We find it somewhat difficult to understand why the employer chose not to make its application to the court below on the ground of the traditional equitable jurisdiction of the court to grant the relief here sought, but instead bottomed its application solely on the authority it finds in the statutes, unless it was because it believed that they afforded a greater chance for success. But since the granting or withholding of relief pursuant to these sections lies expressly within the discretion of the court, the test under it would not be different than that which has already been developed and applied over the years by the courts of equity apart from any statute.

Our Workmen's Compensation Act, *R. S.* 34:15–1 *et seq.*, moreover, makes no specific provision for *post-mortem* examinations to determine the cause of death. Nevertheless, our needs in this field, as we will subsequently show, have been satisfied through the jurisdiction of our traditional courts. In this respect we are unlike some of our sister states; *Ala. Code, Tit. 26, sec. 293; Cal. Labor Code, secs. 5706, 5707; Col. Rev. Stat. 81–18–23; Tit. 29, Fla. Stat., sec. 440.25(6); Ga. Code, sec. 114–503; Burns' Anno. Ind. Stat.* § 40–1227; *Ill. Rev. Stat.* 1953, *ch.* 48, § 172.47; *Md. Code, Art. 101, sec. 27; Neb. Rev. Stat. 48–135; S. C. Code of Laws* § 72–307; *Tenn. Code Ann.* § 50–1004; *Utah Code Ann., sec. 35–1–92; cf. Iowa Code, sec. 141.24; In re Disinterment of Body of Tow,* 53 *N. W. 2d* 283 (*Iowa Sup. Ct. 1952*).

But even in some of the states which provide for autopsical examination under their workmen's compensation statutes the courts have a large measure of discretion, *Ex Parte Gadsden Iron Works,* 247 *Ala.* 180, 24 *So. 2d* 540 (*Sup. Ct. 1946*); *Summit Coal Co. v. Walker,* 214 *Ala.* 332, 107 *So.* 905 (*Sup. Ct. 1926*). The right is not given except

in cases of necessity, *McDermid v. Pearson Co.,* 107 *Ind. App.* 96, 21 *N. E.* 2d 80 (1939). In other jurisdictions autopsies in workmen's compensation cases have been sought under the statutory provisions for medical examinations and have been denied as not being within the contemplation of those provisions, *Golden v. Wilson & Co.,* 129 *Kan.* 100, 281 *P.* 860 (*Sup. Ct.* 1929); *Taylor's* case, 127 *Me.* 207, 142 *A.* 730 (*Sup. Jud. Ct.* 1928). In this State, in *Voorhees v. Smith Schoonmaker Co.,* 86 *N. J. L.* 500 (*Sup. Ct.* 1914), where the family of a deceased employee refused to consent to an autopsy, our former Supreme Court held that "that was their right." We are not alone in holding to this effect; see *Travelers Ins. Co. v. Lay,* 39 *Ga. App.* 273, 146 *S. E.* 641 (*Ct. App.* 1929); *Indianapolis Abattoir Co. v. Bryant,* 67 *Ind. App.* 225, 119 *N. E.* 24 (1918); *Lenoir Car Works v. Hill,* 163 *Tenn.* 578, 44 *S. W.* 2d 321 (*Sup. Ct.* 1931).

The statutory provisions relied upon here by the employer form no part of our workmen's compensation law. *N. J. S. A.* 40:21–30.11, *supra,* originated as part of "An Act concerning chief medical examiners, coroners and county morgue keepers in counties of the second class in this State, defining their powers and duties, and regulating the keeping and use of their records," *L.* 1944, *c.* 182. *N. J. S. A.* 40:21–71 was part of a similar enactment covering counties of the first class, *L.* 1927, *c.* 106. The powers and duties of the medical examiner are the same in each act; see *R. S.* 40:21–66 and *N. J. S. A.* 40:21–30.6, and *cf. R. S.* 40:21–24 with reference to the duties of the county physician generally.

The true meaning of an enactment and the intention of the Legislature in enacting it must be gained, not alone from the words used within the confines of the particular section involved, but from those words when read in connection with the entire enactment of which it is an integral part, *Palkoski v. Garcia,* 19 *N. J.* 175, 181 (1955). When this is done here, the conclusion is inescapable that these powers were intended for public purposes only and for the protection of public health, welfare and safety, as opposed to private rights. They are a part of the administra-

tive machinery whereby the authorities must be advised of every death by violence, casualty or suicide and of every sudden death without apparent cause or in a suspicious or unusual manner. They furnish a supplementary means of determining the cause of such death as an aid in the detection and punishment of crime and the protection of the public health against communicable diseases or epidemics and the like. While the literal sense of the words might appear to furnish authority for the action here, the context in which they are used indicates an over-all purpose of totally different design. These statutes therefore furnish no basis of relief for the employer.

■ Nor is there any basis for relief apart from the statutes. From a very early date in England the ecclesiastical courts had exclusive jurisdiction of the dead and as a consequence the early common law refused to recognize a concept of property rights in the body of a deceased person, 2 *Bl. Comm.* 429. Lord Coke in 3 *Inst.* 203 says it was *"nullius in bonis* and belongs to ecclesiastical cognizance"; see also *Hains Case,* 3 *Co. Inst.* 110, 2 *East P. C.* 652. Thus under English law, once a body was buried it could not be removed except by order of the coroner for the purpose of an inquest or by special dispensation of the consistory court, an ecclesiastical tribunal, or by license of the Secretary of State, *Reg v. Dr. Tristam,* [1898] 2 *Q. B.* 371; 67 *L. J. Q.* 13.857, 79 *L. T.* 74; *In re Pope,* 5 *Eng. L. i& Eq.* 585 (*Consistory Ct.* 1851); *Vestry of St. Pancras v. Vicar and Churchwardens of Parish of St. Martin's-in-the-Fields,* 6 *Jur. N. S.* 540. This concept has been modified somewhat by time and circumstance; for an historical development of present attitudes see *In re Beekman Street,* 4 *Bradf.* 503 (*N. Y. Surr.* 1857); *Koerber v. Patek,* 123 *Wis.* 453, 102 *N. W.* 40, 68 *L. R. A.* 956 (*Sup. Ct.* 1905); *Spiegel v. Evergreen Cemetery Co.,* 117 *N. J. L.* 90, 93 (*Sup. Ct.* 1936).

With the repudiation of the ecclesiastical courts in the American colonies, jurisdiction over these matters passed to the temporal courts. Early Mr. Justice Story pointed out in *Beatty and Ritchie v. Kurtz,* 2 *Pet.* 566, 585; 7 *L. Ed.*

521, 528 (1829), the remedy lay "in the protecting power of the Court of Chancery." In this State the development has been according to the common pattern; see *Peters v. Peters,* 43 *N. J. Eq.* 140 *(Ch.* 1887), *Toppin v. Moriarty,* 59 *N. J. Eq.* 115 *(Ch.* 1899); *Smith v. Shepherd,* 64 *N. J. Eq.* 401 *(Ch.* 1903); *de Festetics v. de Festetics,* 79 *N. J. Eq.* 488 *(Ch.* 1911); *Perth Amboy Gas Light Co. v. Kilek,* 102 *N. J. Eq.* 588 *(E. & A.* 1928); *Fidelity Union Trust Co. v. Heller,* 16 *N. J. Super.* 285 *(Ch. Div.* 1951); *Friedman v. Gomel Chesed Hebrew Cemetery Ass'n,* 22 *N. J. Super.* 544 *(Ch. Div.* 1952); *Guerin v. Cassidy,* 38 *N. J. Super.* 454 *(Ch. Div.* 1955).

 It is now settled beyond question that once a body is buried it is in the custody of the law, and removal or other disturbance of it is within the jurisdiction of our courts with equitable powers.

"* * * [B]ut the power to disturb a dead body should not be exercised, unless it be clearly shown that good cause and urgent necessity for such action exist. * * *

And in a matter such as that before us good cause and urgent necessity are to be gauged and measured by the reasonable probability of the cause of death being capable of establishment by the examination and autopsy." *Perth Amboy Gas Light Co. v. Kilek, supra,* 102 *N. J. Eq.* 588, 590 *(E. & A.* 1928).

In the search for the truth we must not disregard the problems of religion, the wishes of the decedent, the sensitivities of loved ones and friends, or even the elements of public health and welfare; see *R. S.* 26:6-37. The law, then, will not reach into the grave in search of "the facts" except in the rarest of cases, and not even then unless it is clearly necessary and there is reasonable probability that such a violation of the sepulchre will establish what is sought.

In one of the few cases where an autopsy has been ordered, and the only one in this State offered by the employer in support of its position, *Board of Education of the Borough of Red Bank v. Estelle,* (the unreported case which followed our decision in *Estelle v. Board of Education of Borough of Red Bank,* 14 *N. J.* 256 (1954)), the trial court during

the lifetime of a workmen's compensation claimant ordered an autopsy immediately after death and before embalming and burial of his remains to determine whether death was the result of a condition of the lungs which was proximately related to the claimant's employment. There, it was beyond any reasonable question that the autopsy if performed then would disclose the real truth not otherwise determinable.

But here we have no clear or convincing showing that an autopsy would in all reasonable probability disclose the information sought. Dr. Yaguda merely states that from the records he is not able to ascertain the "exact" cause of the decedent's death and that "the exact cause of death would be determined" if an autopsy were performed. He offers no basis for his conclusion, nor does he attempt to discuss whether the element of time or embalming would in any way affect the discovery. We can only assume from his categorical statement that an autopsy would disclose the cause of death that, in his opinion, these elements would not affect the result sought. On the other hand we have the statement of Dr. Bernstein which is not only absolutely to the contrary but which also goes further and sets forth the facts that show the decedent did suffer a heat stroke and, in his opinion, it was one of the contributing causes of death. On this state of the record the body of the decedent was properly left undisturbed.

The judgment below is accordingly affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING and JACOBS—5.

*For reversal*—None.