239 N.J. Super. 81 (1989)
570 A.2d 1028
ANA FELIPE, PLAINTIFF,
v.
LINO VEGA ADMINISTRATOR OF THE ESTATE OF EDILBERTO VEGA, DEFENDANT.
Superior Court of New Jersey, Chancery Division, Atlantic County.
Decided November 15, 1989.
*82 Teofilo Montanez for plaintiff (Montanez & Montanez, attorneys).
J. Llewellyn Mathews for defendant (Apell & Mathews, attorneys).
GIBSON, J.S.C.
By this action plaintiff seeks permission to disinter the body of her now deceased companion and to move it to a cemetery within walking distance of her home. Her application is resisted by the decedent's father who was also the administrator of the estate. The matter was presented to the court in the form of an order to show cause seeking preliminary restraints but after taking testimony from the parties on the return day, it was agreed by counsel that the court should consider that hearing as "final" for purposes of making findings of fact and reaching conclusions of law.

*83 Findings of Fact.

In 1982, plaintiff, Ana Felipe, took up residence with Edilberto Vega and, although they never married, the two of them lived together as husband and wife until Edilberto was killed in an automobile accident on November 4, 1987. While together, the couple had a child, Sueheidi Alexis Vega who was five years old when her father died and who is now seven.
Edilberto left no will and pursuant to intestate succession, his father, Lino Vega, was appointed as administrator of Vega's estate. Vega arranged for Edilberto's burial at St. Mary's Catholic Cemetery in Mt. Holly, New Jersey, that site being close to Vega's residence and also the cemetery where Edilberto's brother was buried. Plaintiff made no objection to the burial arrangements at the time, being grief stricken, disoriented and also unsure of her right to object. Vega also took responsibility for prosecuting a wrongful death claim in behalf of plaintiff's child and was ultimately successful in obtaining a significant recovery.
Although the decedent had certain relatives in the Mt. Holly area, it would appear that their relationship with the decedent during his life was somewhat distant and their visits to the grave site, if any, have been infrequent. Plaintiff, on the other hand, visits the grave site regularly. She has placed a number of religious articles there and has treated it, more or less, as a shrine. Aside from her continuing affection for Edilberto and her desire to keep the memory of her "husband" alive, plaintiff believes that the visits to the grave are important to her daughter in that they provide reinforcement for her memory of her father and her identity with him.
Unfortunately, the cemetery in Mt. Holly is over an hour from plaintiff's home and it has become increasingly difficult to obtain transportation there. Since there is no public transportation to the cemetery and plaintiff does not drive, she has had to rely on others to take her. Because of her fear of driving, she does not intend to obtain a license, and thus, the prospect of *84 a solution to her transportation problem is not likely. Because of these difficulties, plaintiff has sought to have the body removed to a cemetery in Egg Harbor City within walking distance of her home. As part of that effort she has made arrangements with the priest at St. Nicholas Roman Catholic Church to perform the appropriate religious rites, assuming the court permits the move.
Finally, it should be noted that when the decedent was living with plaintiff and their child, they had a very close and loving relationship. In contrast, although Vega appears to be a loving and caring father, his contact with Edilberto during the last seven years of his life appears to have been minimal. It should also be noted that Vega's resistance to having the body moved is not based on any specific religious grounds or even because of his desire to have the grave site at a more convenient location. Rather, it is his belief that it would be unnatural to move the body and that his son should be permitted to "rest in peace."

Legal Conclusions.
Although it is widely recognized, both in this State and elsewhere, that once a body has been buried, there is a strong policy against disturbing it, the notions which support that concept are more spiritual than legal. The burial itself has historically been regarded as a religious rite and the ground where the body rests is generally regarded as consegrated. See Annotation, "Removal and Reinterment of Remains," 21 A.L.R.2d 472, 475 (1952). Despite the policy against disturbing the body of the deceased, under certain circumstances, removal will be warranted and the temporary disturbance of the remains will be justified. Glatzer v. Dinerman, 142 N.J. Eq. 88, 59 A.2d 242 (Ch. 1948). Those circumstances may be both private and public and although public concerns are not implicated here, they generally relate to criminal investigations and public health. See, e.g., N.J.S.A. 26:6-37; Petition of Sheffield Farms Company, 22 N.J. 548, 126 A.2d 886 (1956).
*85 In recognition of the fact that the right to have a body remain undisturbed is not absolute, it has long been held that disinterment after burial is subject to the control of the court of equity. Petition of Sheffield Farms Company, supra at 556, 126 A.2d 886; 22A Am.Jur.2d, Dead Bodies, § 70 (1988). The treatment given to this subject by our courts has varied, however, in part, depending on whether the rights invoked were private or public. Also, although the court rulings appear to be very "fact-sensitive," a presumption against the right of removal has generally prevailed. Ibid. The principle most cited is that, although the removal or other disturbance of a decedent's remains is within the jurisdiction of a court of equity, that power should not be exercised unless it has clearly been shown that good cause and urgent necessity for such action exists. Perth Amboy Gaslight Company v. Kilek, 102 N.J. Eq. 588, 590, 141 A. 745 (E. & A. 1928); Petition of Sheffield Farms Company, supra 22 N.J. at 556, 126 A.2d 886.
A number of factors have been held to bear on a decision to disinter. They include the decedent's stated preference, if any, religious considerations, ownership rights in the plot, the closeness of the relationship between the petitioner and the decedent and the lapse of time from the original interment. See 22A Am.Jur.2d, supra at 54-57. Also included is the petitioner's desire to satisfy a longing that "those united during life shall not be divided after death." Friedman v. Gomel Chesed Hebrew Cemetery Ass'n of Elizabeth, 22 N.J. Super. 544, 549, 92 A.2d 117 (Ch.Div. 1952). Finally, there is a general agreement that if there is a surviving spouse, that person has the primary and paramount right to the possession of the body and the right to control its burial and other disposition. Id. at 56. Although it was held in at least one case that, once the duty of providing a proper grave site has been discharged, the control of the surviving spouse ceases, Smith v. Shepherd, 64 N.J. Eq. 401, 54 A. 806 (Ch. 1903), that view has been criticized as being unnecessarily harsh. See Annotation, supra, 21 A.L.R.2d at 503.
*86 Applying these principles to the facts of this case, it would be easy to justify a conclusion that plaintiff's application should be denied. For one thing, she does not have the legal status of a spouse. In addition, she has waited almost two years to pursue this application. Finally, her reasons for the move, although quite reasonable, cannot fairly be classified as constituting "urgent necessity." On the other hand, one must question what legitimate policy reasons would be served by rejecting this otherwise reasonable request. For example, what logic supports the requirement for a showing of "urgent necessity" in this setting? Such a proposition may fit reasonably well when the grounds for the disinterment are based on public interest or economic concerns. Sheffield Farms Company, supra (involving a workmen's compensation investigation) and Perth Amboy Gaslight Company v. Kilek, supra (autopsy was requested). But where, as here, the considerations are purely equitable and the balance focuses on more spiritual considerations such as love and devotion, such a dispute will rarely if ever invoke urgency. Indeed, if urgency is the true test, it would appear that few of the cases where removal was authorized would have been justified. See generally, 22A Am.Jur.2d, supra; Annotation, supra, 21 A.L.R.2d at 472; Friant v. Dolbow, 41 N.J. Super. 84, 124 A.2d 12 (Ch. 1956). Accordingly, in the absence of public health concerns or investigative needs, the concept of urgent necessity seems to have little relevancy.
If the test here is "good cause" and whether the presumption against the right of removal has been overcome, what is really involved is a weighing process which invokes the classic exercise of discretion which is the heart of equity. Such a balance includes consideration of the legitimate devotional needs of plaintiff and her child weighed against the father's desire not to disturb the "peace" of his son. Although plaintiff's position may arguably be labeled as no more than a matter of convenience, given this court's factual findings in that regard, what otherwise may be referred to as "convenience," should more *87 fairly be characterized as "necessity," or at least reasonable access. Balancing these various factors, the natural affection and devotional desires of plaintiff appear more compelling than the father's desire that the remains of his son be left to rest in peace.
Although the spiritual considerations which attach to a burial site should never be taken lightly and although questions of removal will always involve a balance favoring non-removal, the natural desires and needs of the living should still be considered paramount absent some stated preference by the decedent. Annotation, supra, A.L.R.2d at 518; Neighbors v. Neighbors, 112 Ky. 161, 65 S.W. 607 (Ct.App. 1901). In this case, the decedent has expressed no preference. Cf. Guerin v. Cassidy, 38 N.J. Super. 454, 119 A.2d 780 (Ch. 1955). Since both of these grave sites will be sanctified by the church and neither side has invoked any religious considerations, the reasons advanced by plaintiff in behalf of herself and her child have considerable merit.
In reaching this conclusion, I am persuaded that plaintiff's love for the decedent continues to be strong and that her desire to express her devotion to him is a substantial force in her life. I am also persuaded that, although change and new relationships are a natural part of everyone's life, given the lapse of time since decedent's death and plaintiff's continuing strong feelings on the subject, her sentiments do not appear to be transitory. Finally, I am persuaded that a change in the grave site will have no significant impact on the father's emotional needs or his ability to visit his son's grave. On balance, therefore, it is the conclusion of this court that the presumption against the right of removal has been overcome and that good cause has been proven. See Novelli v. Carroll, 278 Pa.Super. 141, 420 A.2d 469 (1980); Brake v. Mother of God's Cemetery, 251 Ky. 667, 65 S.W.2d 739 (Ct.App. 1933).
There are two questions left open by the above conclusion: one relates to the impact of the delay; the second is whether *88 the result should be any different because plaintiff and the decedent were never married. With respect to the latter question, although the couple lived together as man and wife there is no question that New Jersey does not recognize common law marriages. N.J.S.A. 37:1-10. On the other hand, I see no reason why plaintiff's non-marital status alters any of the considerations already related. Plaintiff's love and her devotional needs seem no less strong because of it.
Although this court can anticipate circumstances where the lack of a legal relationship between partners may make a significant difference in a balancing process like this, given the facts here, it is relatively insignificant. This is not a case where the court is testing the rights of the father against those of his son's unmarried partner. The considerations relied on by each side here were equitable, not legal. Even if legal considerations were invoked, the result being reached here is more likely to fulfill the presumed intentions of the decedent than the status quo. See generally, Annotation, "Disposition of Corpse-Decedent's Wishes," 54 A.L.R.3d 1037 (1973).
Nor can the rights of the child be ignored. Although the value of this move to the child may seem debatable, given the absence of evidence to the contrary, the judgment of her mother and natural guardian is entitled to some deference.
As for plaintiff's delay in bringing this action, I am prepared to accept her explanation that, given the sudden and violent nature of Edilberto's death, she was too grief stricken and confused regarding her rights to take a more aggressive position. Also, it has only been in recent months that her transportation problems have become so serious. Novelli v. Carroll, supra; Brake v. Mother of God's Cemetery, supra. The circumstances which might otherwise invoke estoppel are, therefore, not present. Cf. Smith v. Sheppard, supra.

Conclusion.
Plaintiff's request invokes fundamental and firmly-held concepts regarding the rights of both the dead and the living. *89 Although the court recognizes the strong policy against moving a decedent's remains, and although plaintiff has not demonstrated any urgent necessity, the factors she advances are substantial and clearly outweigh those of defendant. I have, therefore, concluded that the presumption against the right of removal has been overcome and good cause has been shown. The petition will be granted and the decedent's body may be removed. All expenses associated with this move will lie with plaintiff and the reinterment must be conducted with appropriate religious supervision and sensitivity.
Plaintiff's attorney should submit an order consistent with the above.