750 A.2d 229 (1999)
330 N.J. Super. 638
George Flamma SHERMAN, Jr., and Corina Sherman, Plaintiffs,
v.
Mary Antoinette SHERMAN; Kendrick Brown; and Pfleger Funeral Home, Defendants.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided July 25, 1999.
*231 Clairmont Chung & Associates (Clairmont Chung, appearing), Irvington, for plaintiffs.
No other appearances.
*230 FISHER, P.J.Ch.

I
Plaintiffs George Sherman, Jr. and Corina Sherman ("plaintiffs") are the children of the late George Sherman, Sr. ("the decedent"). Defendant Marie Antoinette Sherman[1] is the widow of decedent; she and decedent are alleged to have lived separately for the last four years. During the evening of July 23, 1999, plaintiffs sought an emergent ex parte order prohibiting the burial of the decedent planned by defendants for the morning of July 24, 1999. Because, among other things, the law appears to acknowledge the supremacy of even an estranged surviving spouse's intentions as to burial over a child's intentions, the application has been denied.[2]

II
In approaching such an application, the record should be examined to determine whether the movant has demonstrated (1) a reasonable probability of success on the claim underlying the relief requested; (2) the harm to the movant, if the relief is not granted, outweighs the harm to the opponent if it does; and (3) substantial and irreparable injury imminently awaits. See, e.g., Crowe v. DeGioia, 90 N.J. 126, 447 A.2d 173 (1982).[3] A fair consideration of these factorsall of which must weigh in favor of the relief sought, see, S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371 (3d Cir.1992)[4]demonstrates that the application must be denied.
There is also, because of the drastic nature of the remedy, an obligation to insure that the opponent is afforded procedural due process. In light of the timing and circumstances by which the matter has come before the court, the extent to which defendants have been afforded due process is a matter of great concern and that to which the court first directs its attention.

A. Procedural Due Process
A court of equity must always be vigilant in ensuring that fundamental fairness is afforded to defendants whose opportunity to respond to such an emergent application is severely limited or even eliminated by circumstances. In this case, plaintiffs have moved for relief at such a late hour that no semblance of due process has been afforded to defendants. As far as the court knows, defendants are completely unaware of this application. While our courts insist upon a clear and convincing showing of the Crowe v. De Gioia factors in less expeditious circumstances, Subcarrier Communications, Inc. v. Day, 299 N.J.Super. 634, 639, 691 A.2d 876 (App.Div.1997), such a "midnight" ex parte application must be viewed with even greater scrutiny due to the exclusion of defendants' voices from the process.
Indeed, because of the potential for a deprivation of procedural due process in *232 this setting, our court rules rather insistently require that ex parte applications for injunctive relief conform to certain specific and important requirements. For example, the application must be supported by a verified complaint and accompanied by a brief. See, R. 4:52-1(a) and (c). R. 4:52-1(a) also prohibits a court from issuing an order to show cause with temporary restraints in the absence of notice to defendant unless it can be concluded that "immediate and irreparable damage will probably result to the plaintiff before notice can be served or informally given and a hearing had thereon." Plaintiffs' application lacks all these things. There is no indication that notice has been given to defendants either formally or informally. The complaint, which consists of one page, is not verified. No certification or affidavit accompanies the application. No brief was provided. And there is no indication that plaintiffs "will probably" suffer "immediate and irreparable damage" before notice is given. In short, under the circumstances, the court must ask: where is the evidence to suggest that if defendants knew of this application they would rush to bury decedent or take such action which might moot the application? The submission of plaintiffs woefully fails to provide any semblance of compliance with our court rules.
The court's ruling could begin and end with this analysis of the procedural posture of the matter. It must be recalled that "[t]he power to issue injunctions is the strongest weapon at the command of a court of equity, and its use, therefore, requires the exercise of great caution, deliberation and sound discretion." Light v. National Dyeing & Printing Co., 140 N.J.Eq. 506, 510, 55 A.2d 233 (Ch.1947). An injunction is a drastic remedy because it instantly reaches into a dispute and compels a party, under pain of contempt or other coercive powers of the court, to do or not do a particular act. Broadly speaking, it is a command which prohibits the exercise of free choice or action. Moreover, an injunction often alters the outcome of a lawsuit in a way unlikely or impossible to later undo. Recognizing this extraordinary power for what it is, the only appropriate exercise of discretion requires a denial of this last minute ex parte application. Nevertheless, considering the unusual nature of the claim, it is perhaps helpful to expound further on the Crowe v. De Gioia factors as they apply here.

B. Likelihood of Success
Chief among the factors to be considered is the requirement that plaintiffs demonstrate a reasonable probability of success on the merits. In other words, the movant must clearly and convincingly show that the material facts are not in dispute, see, Anders v. Greenlands Corp., 31 N.J.Super. 329, 338, 106 A.2d 361 (Ch.Div.1954), and the legal claim upon which the application is based is settled or free from doubt, see, Accident Index Bureau, Inc. v. Male, 95 N.J.Super. 39, 50, 229 A.2d 812 (App.Div.1967), aff'd 51 N.J. 107, 237 A.2d 880 (1968), app. dis. 393 U.S. 530, 89 S.Ct. 872, 21 L.Ed.2d 754 (1969); J.H. Renarde, Inc. v. Sims, 312 N.J.Super. 195, 201, 711 A.2d 410 (Ch.Div.1998). Plaintiffs have failed in both respects.
First, the facts presented while not disputedalthough those facts are only undisputed because defendants have not been given an opportunity to respondare so sketchy as to greatly hamper the court's understanding of the surrounding circumstances and inordinately inhibit its ability to analyze the competing rights of the parties. The entire complaint consists only of the following allegations:
1. They [plaintiffs] are the custodians of their Father, decedent, George Sherman, Sr. and that such custody was granted by contract signed by George Sherman, Jr., and defendant, wife of the decedent, Marie Antoinette Sherman. (See Exhibit 1)
2. Plaintiffs assert that defendant, Marie Antoinette Sherman though married to the decedent by way of ceremony in *233 Liberia abandoned the decedent and played no role as wife for the last four years.
3. They assert that, in addition their father is of part of the Royal Chieftaincy that requires burial in traditional sites and on agreement with other members of the Royal order. This necessitates the return of the body to Liberia.
4. That defendants attempts to bury the decedent at 10 a.m., July 24, 1999, amounts to a breach of contract and of the royal decree.[5]
5. Plaintiffs also allege a cover up of the circumstances of the death and that an autopsy confirm physical abuse and mistreatment by the nursing home.
6. Wherefore, Plaintiffs, George Sherman, Jr., and Corina Sherman, both children of the decedent, demand that defendants be restrained from pursuing and completing the burial scheduled for Saturday, July 24, 1999, at 10 a.m., and that custody of the body be vested in plaintifss [sic] so that they may facilitate the return of the body to Liberia for burial according to the traditional decree.
In a nutshell, putting aside the reckless and unsupported allegations of physical abuse to the decedent at the hands of some unnamed nursing home, plaintiffs allege that decedent is about to be buried in a manner directed, apparently, by his wife, but in a manner inconsistent with the traditions of Liberian royalty. Plaintiffs claim decedent and his wife were estranged for the last four years and that they, by way of a "custody agreement," have a greater right to dictate the disposition of decedent's remains than she.
The matter is properly lodged in this Division, the current successor to the English ecclesiastical courts which had exclusive jurisdiction over the dead. Petition of Sheffield Farms Co., 22 N.J. 548, 555-556, 126 A.2d 886 (1956). A review of our case law suggests that disputes over the remains of a person are unusual. Only slightly more common are claims seeking the disinterment of a body. See, e.g., Sheffield, supra; Felipe v. Vega, 239 N.J.Super. 81, 570 A.2d 1028 (Ch.Div.1989); Camilli v. Immaculate Conception Cemetery, 244 N.J.Super. 709, 583 A.2d 417 (Ch.Div.1990); Acevedo v. Essex County, 207 N.J.Super. 579, 586, 504 A.2d 813 (Law Div.1985). While there certainly are differences between a claim for a particular disposition of a decedent's remains and a claim for disinterment, a common thread appears. That is, our courts have been and should be quite hesitant to intrude into such intensely private affairs absent a compelling showing of necessity. See, e.g., Judge Gibson's opinion in Felipe, supra, 239 N.J.Super. at 84, 570 A.2d 1028.
Here, plaintiffs claim a superior right to dictate the terms of interment. This is supported, they say, by a "custody agreement" executed by decedent's wife and plaintiff George Sherman, Jr., among others.[6] It is of more than passing interest that the "custody agreement" appears not to have been signed by the decedent. It states, in part, that "I, Mary Antoinette Sherman, wife of George Flamma Sherman, Sr, being in [sic] sound mind and free of any coercion or duress, do hereby grant permanent custody of my husband, said mentioned person, to his son George Flamma Sherman, Jr., of Kansas City, Missouri." What, then, are plaintiffs suggesting in relying upon this document? Are they saying that two or more people can enter into an agreement empowering one of them to control and dictate the terms and conditions by which another person may live? The record does not reveal that *234 decedent was a minor or an incapacitated person in need of a guardian. He was an adult, possessing life, liberty and the other inalienable rights constitutionally conferred. The decedent was not property to be "given" by one person to another. Is it really necessary to cite any authority other than the Thirteenth Amendment to the Constitution of the United States to demonstrate the fallacy of the theory apparently espoused by plaintiffs? That theory was once the law of this land, finding its highwater mark with the Dred Scott decision,[7] before a resulting Civil War and the issuance of the Emancipation Proclamation demolished it. Plaintiffs have offered no contrary legal or factual analysis which would remotely suggest their right to take "possession" of the decedent during his lifetime nor is this court prepared now, or ever, to suggest that one person may lawfully exert dominion over another free person in this manner.
Of course, that too is beside the point. What control may have been exerted over George Sherman, Sr. in life has little, if anything, to do with control over his remains after death. The issue, then, once this "custody agreement" is rightfully excluded from an analysis of the issues, is whether the right of the decedent's children to dictate a disposal of decedent's remains is superior to his wife's. Many earlier decisions indiscriminately describe the person or persons possessing the "right to burial" as the decedent's "family", the "next of kin" or the "nearest relative."[8] Many of those cases, however, involved situations where there was solidarity among family members and not internecine disputes such as the case at hand. Such decisions, therefore, provide little guidance. Earlier authorities also wrestled with the significance of a decedent's testamentary directions as to final disposition. The majority of jurisdictions, relying upon English common law[9], appear to have concluded that a testator could not direct the disposition of remains because a dead body could not be viewed as property belonging to the estate. See, e.g., Fidelity Union Trust Co. v. Heller, 16 N.J.Super. 285, 290, 84 A.2d 485 (Ch.Div.1951).[10]
*235 In those cases where disputes arose among family members as to the disposition of the remains of a loved one, courts generally concluded that the surviving spouse's desires had priority over other relatives, including children of the decedent. See, e.g., Hudek v. St. Peter Greek Catholic Cemetery Ass'n, 101 N.J.Eq. 399, 400, 138 A. 654 (Ch.1927), aff'd o.b. 102 N.J.Eq. 322, 140 A. 465 (Ch.1928); Hackett v. Hackett, 18 R.I. 155, 26 A. 42 (1893); Pettigrew v. Pettigrew, 207 Pa. 313, 56 A. 878 (1904). This appears to be true even when the surviving spouse was estranged from the decedent although only a single 100 year old decision could be located to support that view. See, Enos v. Snyder, 131 Cal. 68, 71, 63 P. 170, 172 (1900). But it is a vain search which seeks reliable guidance on the subject in these earlier decisions.
Fortunately, our Legislature has brought clarity to the general rules that may be glimpsed through the mist of the common law. N.J.S.A. 8A:5-18 has prioritized those persons who possess an interest in controlling the disposition of the dead. In fact, the statute also includes decedents within the class of persons who have a say in the matter, which is a distinct departure from the common law. N.J.S.A. 8A:5-18 mandates that
The right to control the disposition of the remains of a deceased person, unless other directions have been given by the decedent or by a court of competent jurisdiction shall be in the following order:
a. The surviving spouse.
b. A majority of the surviving children of the decedent or the surviving child if one.
c. The surviving parent or parents of the decedent.
d. A majority of the brothers and sisters of the decedent if no child or parent is living.
e. Other next of kin according to the degree of consanguinity.
In delineating the rights of family members, the statute clearly places the decedent first. Indeed, the decedent's preference may be determined by resort to both testamentary and nontestamentary statements. See, Bruning v. Eckman Funeral Home, 300 N.J.Super. 424, 429, 693 A.2d 164 (App.Div.1997).
Here, there is no allegation that decedent left a Last Will and Testament stating his preference. The only bit of information that has been provided concerning decedent's preference is a handwritten document telecopied to the court along with the complaint and proposed *236 order to show cause. This document, while bearing some resemblance to an affidavit or certification,[11] is not signed and the author's identity is not revealed. Moreover, there is no indication that this anonymous author was under oath nor does the document contain a certification in lieu of oath, contrary to R. 1:4-4(b) and (c). The document does state that "the proposed burial [in Middletown] is against deceased wishes who specified he wished to be buried in traditional tribal area Bassa, Liberia as one of last of traditional chiefs there." While the Appellate Division has determined that hearsay statements will be permitted in such matters, see, Bruning, supra, 300 N.J.Super. at 429, 693 A.2d 164, this alleged statement has not been conveyed to the court in the manner required by court rule, see, R. 1:4-4 and 1:6-6, and, thus, does not at all move the court in determining the reasonable probability of plaintiffs' success on the merits.
Since there is no competent evidence of decedent's preference, N.J.S.A. 8A:5-18 specifies that the "surviving spouse's" preference then has priority. Plaintiffs do not dispute that defendant Marie Antoinette Sherman was lawfully married to decedent at the time of his death. Complaint, ¶ 1. Plaintiffs did not submit a brief nor mention any of the authorities set forth above. But they doubtless would contend that with the alleged estrangement, decedent's wife lost the statutory preference set forth in N.J.S.A. 8A:5-18(a). While that issue has some appeal, it seems more likely the Legislature, in referring to "surviving spouse" in that statute, intended to include an estranged "surviving spouse." For example, in a similar context, the Legislature has exhibited the ability to draw the distinction when it so desired. See, N.J.S.A. 3B:8-1.[12] Because the Legislature chose not to expressly limit the class of "surviving spouses," it must be concluded that an estranged surviving spouse would be included. It is also noteworthy that the Legislature utilized similar terms and set forth a similar order of preference in declaring what persons may authorize a donation of the organs or body parts of a dead person. See, N.J.S.A. 26:6-58(b).[13] Accordingly, it does not presently appear "reasonably probable" that plaintiffs would succeed in proving they possessed a superior right to dispose of the remains than defendant Marie Antoinette Sherman, even if it could be shown that she and decedent were estranged at the time.

*237 C. Irreparable Injury
Plaintiffs must also show they face immediate, substantial and irreparable injury if the interlocutory injunction does not issue. See, Crowe, supra, 90 N.J. at 132-133, 447 A.2d 173; Citizens Coach Co. v. Camden Horse R.R. Co., 29 N.J.Eq. 299, 303-304 (E. & A. 1878). As to this factor, the court finds the application wanting in two respects.
First, while troublesome, the injury which plaintiffs seek to fend offthe burial of decedent in Middletownis not necessarily irreversible.[14] The court, as noted earlier, possesses jurisdiction to order disinterment upon an appropriate showing. See, Felipe, supra. If the facts and circumstances ultimately support plaintiffs' position in all respects, and the court finds it necessary to grant such relief, the decedent could be disinterred and the remains turned over to plaintiffs for an alternate disposition.
Second, it is only plaintiffs' delay in commencing this action and pursuing a temporary restraining order that supports any claim to the occurrence of an "immediate" injury. While the complaint is silent in this regard, counsel for plaintiffs orally advised the court that decedent died on July 15, 1999, 8 days before the filing of the complaint. Plaintiffs provide no explanation for this delay. Certainly 8 days does not normally evoke notions of laches but, considering the context, it strikes the court as an unusually long period of time between death and burial. A far more diligent effort on plaintiffs' part would have allowed ample time to (1) give defendants notice of the claim, (2) provide all parties with an opportunity to submit more appropriate and comprehensive papers to the court and (3) schedule a plenary hearing to resolve any disputed fact questions. By waiting until the eve of decedent's funeral, plaintiffs rendered illusory the court's and the parties' ability to engage in a full and careful study of this matter.
In light of the above, the court cannot conclude plaintiffs face either immediate or irreparable injury if the injunction does not issue.

D. Balancing the Hardships
Temporary injunctive relief should not issue unless it can be said the injury to plaintiffs if the injunction does not issue outweighs the harm to defendants if it does. Zoning Bd. of Adjustment of Tp. of Sparta v. Service Elec. Cable Television of New Jersey, Inc., 198 N.J.Super. 370, 379, 487 A.2d 331 (App.Div.1985). The injury to plaintiffs in the absence of an injunction consists of the trouble and expense to which they may be put if the remains need to be disinterred. On the other hand, it is rather obvious that to issue the injunction on the eve of the funeral would disrupt that intensely personal event and no doubt cause great anguish to members of what already appears to be a troubled family. Even in a light favorable to plaintiffs, these competing interests are at best in equipoise and, thus, this balancing does not favor the relief sought.

III
For the foregoing reasons, the application for the issuance of an order to show cause with temporary restraints has been denied.
NOTES
[1] The papers submitted refer to this defendant as both "Marie" and "Mary." The court has no way of knowing which is correct but will use the former throughout this opinion.
[2] The complaint, proposed order to show cause and other documents were provided to the court by telecopier at approximately 7:00 p.m. on July 23, 1999. An order denying the issuance of a temporary restraining order was entered at 8:15 p.m. and immediately telecopied to plaintiffs' counsel.
[3] It has also been recognized that the injunction's impact on the public welfare should be considered. That factor, however, does not appear to be implicated in this private matter.
[4] A court, however, may take a less rigid view in its consideration of these factors when the interlocutory injunction sought is designed only to preserve the status quo. See, General Electric Co. v. Gem Vacuum Stores, 36 N.J.Super. 234, 236-237, 115 A.2d 626 (App.Div.1955).
[5] While the complaint gives no such indication, the court has been advised by counsel for plaintiffs that the burial is to occur in the Leonardo section of Middletown, New Jersey.
[6] This agreement purports to have been signed by plaintiff George Flamma Sherman, Jr., defendant Marie Antoinette Sherman, defendant Kendrick Brown, and two others whose names cannot be deciphered and who are not identified in the text of the agreement.
[7] Dred Scott v. Sanford, 60 U.S. 393, 19 How. 393, 15 L.Ed. 691 (1856).
[8] See, e.g., Bray, "Personalizing Personalty: Toward a Property Right in Human Bodies," 69 Tex. L.Rev. 209, 227 (1990) ("the family's right"); Hearon v. City of Chicago, 157 Ill.App.3d 633, 637, 110 Ill.Dec. 161, 510 N.E.2d 1192, 1195 (1987) ("next of kin"); Smialek v. Begay, 104 N.M. 375, 376, 721 P.2d 1306, 1307 (1986) ("nearest relative"), cert. denied 479 U.S. 1020, 107 S.Ct. 677, 93 L.Ed.2d 727 (1986). In delineating a related cause of action, the American Law Institute has determined that one who interferes with the right to burial will be liable "to a member of the family of the deceased who is entitled to the disposition of the body." Restatement (Second) of Torts, § 868. English law also once recognized that the owner of the house in which the person died possessed a right of burial. Regina v. Stewart, 113 Eng.Rep. 1007, 1009 (1840).
[9] Williams v. Williams, 20 Ch.Div. 659 (1882).
[10] A related difficulty of passing interest is whether the remains of a dead person constitute property. One court which canvassed the subject concluded "[i]t is universally recognized that there is no property in a dead body in a commercial or material sense. `[I]t is not part of the assets of the estate (though its disposition may be affected by the provision of the will); it is not subject to replevin; it is not property in a sense that will support discovery proceedings; it may not be held as security for funeral costs; it cannot be withheld by an express company, or returned to the sender, where shipped under a contract calling for cash on delivery; it may not be the subject of a gift causa mortis; it is not common law larceny to steal a corpse. Rights in a dead body exist ordinarily only for purposes of burial and, except with statutory authorization, for no other purpose.'" Dougherty v. Mercantile-Safe Deposit & Trust Co., 282 Md. 617, 620 n. 2, 387 A.2d 244, 246 n. 2 (Ct.App.1978). Some courts have spoken of a "property right" in a body "usually in the next of kin, which did not exist while the decedent was living, cannot be conveyed, can be used only for the one purpose of burial, and not only has no pecuniary value but is a source of liability for funeral expenses. It seems reasonably obvious that such `property' is something evolved out of thin air to meet the occasion, and that it is in reality the personal feelings of the survivors which are being protected, under a fiction likely to deceive no one but a lawyer." State v. Powell, 497 So.2d 1188, 1192 (Fla.Sup.Ct.1986), cert. denied 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 856 (1987). Many years ago, in Spiegel v. Evergreen Cemetery Co., 117 N.J.L. 90, 93, 186 A. 585 (Sup.Ct.1936), the court held "that the right to bury the dead and preserve the remains is a quasi right in property, the infringement of which may be redressed by an action in damages." That approach has been accepted, although somewhat uncomfortably, by our Supreme Court in Strachan v. John F. Kennedy Memorial Hospital, 109 N.J. 523, 530, 538 A.2d 346 (1988). There, the Court "pause[d]" to express its "agreement with a commentator's observation about the `somewhat dubious' nature of a property right to the body." In short, it appears that in this State a dead body is no longer res nullum, but the extent of the quasi-property rights which a dead body create remains uncertain. Considering the advancement of science, and what can be done with the organs and other parts of cadavers, this question is not likely to fade but may very well intensify in the future. See, Powell, supra, 497 So.2d 1188 (finding no federal constitutional deprivation in a statute which permitted the removal of corneal tissue from a cadaver; the statute prohibited removal upon the objection of the next of kin but did not require that notice be given to the next of kin); Bray, supra, 69 Tex. L.Rev. 209; Schiff, "Arising from the Dead: Challenges of Posthumous Procreation," 75 N.C. L.Rev. 901 (1997); Barrad, "Genetic Information and Property Theory," 87 Nw. U. L.Rev. 1037 (1993); Jaffe, "`She's Got Bette Davis[`s] Eyes': Assessing the Nonconsensual Removal of Cadaver Organs Under the Takings and Due Process Clauses," 90 Colum. L.Rev. 528 (1990).
[11] That is, the document contains a caption and is divided into numbered paragraphs. R. 1:4-4(a).
[12] N.J.S.A. 3B:8-1 (emphasis added) states: "If a married person dies domiciled in this State, on or after May 28, 1980, the surviving spouse has a right of election to take an elective share of one-third of the augmented estate under the limitations and conditions hereinafter stated, provided that at the time of death the decedent and the surviving spouse had not been living separate and apart in different habitations or had not ceased to cohabit as man and wife, either as the result of judgment of divorce from bed and board or under circumstances which would have given rise to a cause of action for divorce or nullity of marriage to a decedent prior to his death under the law of this State." This particular statute demonstrates two premises germane to the present question. First, the Legislature is quite capable of drawing a distinction between happily married surviving spouses and estranged surviving spouses if that is the Legislature's intent. And second, the term "surviving spouse" is not to be equated, without further evidence, with "surviving and residing together spouse." That is, as to this last point, the Legislature, by way of N.J.S.A. 3B:8-1, has demonstrated that it understands there are "surviving spouses" who may be estranged from the decedent and "surviving spouses" who may not be estranged from the decedent. Accordingly, the use of the phrase "surviving spouse" does not bespeak the latter but, in fact, appears to suggest both.
[13] "Any of the following persons, in order of priority stated ... may give all or any part of the decedent's body for any purpose specified in [N.J.S.A. 26:6-59]: (1) The spouse, (2) An adult son or daughter, (3) Either parent, (4) An adult brother or sister, (5) A guardian of the person of the decedent at the time of his death, (6) Any person authorized or under obligation to dispose of the body."
[14] Obviously, the court would no doubt view this factor differently if, for example, a cremation and scattering of ashes or burial at sea were planned. But that is not what has been alleged.