981 A.2d 855

JOAN MARINO, PLAINTIFF–RESPONDENT, v. LARRY L. MAR-
INO, JR., BRETT MARINO, JENNIFER MARINO, JOHN MARI-
NO AND DOROTHY MARINO, DEFENDANTS–APPELLANTS.

Argued January 6, 2009—Decided September 24, 2009.

316

*Robert Gregory Leonard* argued the cause for appellants (*The Rotolo Law Firm*, attorneys; *Mr. Leonard* and *William E. Reutelhuber*, on the briefs).

*Alan J. Baldwin* argued the cause for respondent (*Broderick, Newmark & Grather*, attorneys; *Mr. Baldwin* and *Martin Newmark*, on the brief).

Justice HOENS delivered the opinion of the Court.

This appeal, which comes before the Court as of right based on the opinion of the dissenting Appellate Division judge, requires the Court to interpret the provisions in the New Jersey Cemetery Act of 2003, *N.J.S.A.* 45:27–1 to –38, governing interment, *N.J.S.A.* 45:27–22, and disinterment, *N.J.S.A.* 45:27–23. Specifically, this dispute, between a decedent's surviving spouse and children about his final resting place, raises the question of whether the statutory provision that invests a surviving spouse with the authority to designate a place of interment, absent a contrary written declaration in the decedent's will, also affords that spouse primacy in demanding disinterment notwithstanding statutory language to the contrary.

Because we conclude that the plain language of the statutory provisions relating to interment and disinterment expresses that a different regulatory scheme applies to each, we agree with the dissenting judge, and we conclude that the appellate panel's

majority view, that the provisions must be read *in pari materia,* was in error.

I.

The facts that are germane to our analysis are as follows. Plaintiff Joan Marino married the decedent Larry Marino Sr. in 1982. At the time, he had two children from a prior marriage, and he thereafter had four children with plaintiff. When decedent died in October 2005, two of his children with plaintiff, Nicholas and Daniel, were still minors. The other four, all defendants in the litigation, were the two children from his prior marriage, Larry Jr. and Brett, and two of his children with plaintiff, Jennifer and John.

During the final years of the marriage, the relationship between plaintiff and decedent had deteriorated, although they had not divorced or formally separated. Decedent's will, which contained no instructions concerning where he wanted to be buried, appointed Larry Jr. and Jennifer to be his co-executors. Larry Jr. consulted with an attorney who advised him that, as a co-executor, he was authorized to decide questions concerning the disposition of decedent's remains.

Larry Jr. and Jennifer believed that their father wished to be buried in a cemetery plot owned by defendant Dorothy, who is decedent's mother and their grandmother. That plot is where Dorothy will eventually be buried and is also near where decedent's father was already buried. Plaintiff, however, disagreed. She wanted decedent to be buried in a plot in the same cemetery that she and decedent had acquired through her mother and where she intends to be buried eventually as well. That plot is near her family's plots and is located about forty feet away from decedent's family's plots.

During a meeting among the parties two days after the death, the adult children and Daniel told plaintiff that they had voted unanimously to have their father buried in his mother's plot, arguing that it had been his preference to be there, rather than

with plaintiff's family. Plaintiff, however, insisted that she and decedent had purchased the other plot, intending to be buried there, and that she did not want to be buried with decedent's family. The children countered by pointing out that the marriage had disintegrated and that decedent had repeatedly told them and others that he did not desire to be buried with her family.

As the disagreement continued, the same group of the children, with the exception of Larry Jr., voted again, with the result that they were still united in their view that decedent wanted to be buried near his father. When plaintiff asserted that she had the right to decide as the surviving spouse, Larry Jr. disagreed, telling her that the authority to decide was given to him and Jennifer as the co-executors. In an effort to resolve the dispute, however, defendants proposed that decedent be buried so that plaintiff's body could eventually be "stacked," that is, buried on top of his. Although defendants believe that plaintiff agreed with this proposal, plaintiff insists that she did not. Rather, she contends that Larry Jr. threatened to bar her from the funeral home and the services if she did not capitulate, a charge he denies. She asserts that she decided to permit the burial to take place because she believed she had no choice. On October 27, 2005, decedent was buried in the plot owned by his mother and near the one where his father was buried.

Eight months after the burial, in June 2006, plaintiff filed her Verified Complaint and Order to Show Cause seeking authorization from the Chancery Division to disinter decedent's remains and rebury them in the plot that she preferred. The judge presided over two days of hearings on the issues. During the trial, numerous witnesses testified about the state of the marriage and the desires expressed by decedent about his final resting place.

On November 29, 2006, the trial court issued its written opinion. That decision rested on two essential findings of fact. First, the court found that plaintiff had not voluntarily agreed to allow decedent to be buried where he was, but had been unduly pres-

sured to give in under circumstances that were overwhelming. In particular, the court was persuaded that plaintiff believed that defendants had the prerogative to decide where decedent would be buried and that she had acquiesced because of Larry Jr.'s threat to exclude her from the funeral. Second, however, the trial court found that decedent's clear intention was that he wanted his remains buried near his father's plot, that he did not want to be buried near plaintiff's family, and that, once buried, he would not want his remains disinterred.

Applying the law to these findings of fact, the court began by acknowledging that because decedent did not appoint anyone in his will to decide the disposition of his remains, plaintiff, his surviving spouse, was statutorily authorized to do so. *See N.J.S.A.* 45:27–22(a). Nevertheless, the court framed the primary issue not as being who was initially empowered to act, but instead as "whether the remains of the parties' beloved husband and father should be disinterred and relocated." As to that question, the court identified the disinterment statute, *N.J.S.A.* 45:27–23, as the controlling statute and considered how it should be applied to the matter.

The Chancery Division reviewed the matter against the framework ordinarily applicable to requests for permanent injunctive relief, *Paternoster v. Shuster*, 296 *N.J.Super.* 544, 556, 687 *A.2d* 330 (App.Div.1997); *see Crowe v. De Gioia*, 90 *N.J.* 126, 132–34, 447 *A.2d* 173 (1982) (identifying standards generally applicable to preliminary injunctive relief), observing that courts of equity have long been vested with authority to address questions relating to "removal or other disturbance" of dead bodies, *In re Sheffield Farms Co.*, 22 *N.J.* 548, 556, 126 *A.2d* 886 (1956). In analyzing the question presented, the court recognized that although there is a longstanding public policy disfavoring disinterment, several factors have traditionally been considered to be relevant, with the decedent's preference being the most important. *See Felipe v. Vega*, 239 *N.J.Super.* 81, 84–87, 570 *A.2d* 1028 (Ch.Div.1989).

Noting that the interment statute, *N.J.S.A.* 45:27–22, requires compliance with a decedent's preference only if it is expressed in a Last Will and Testament, the Chancery Division found no similar limitation on its equitable power to decide the question of disinterment. In that circumstance, the court concluded that decedent's preference for burial was paramount, *see Bruning v. Eckman Funeral Home*, 300 *N.J.Super.* 424, 431, 693 *A.2d* 164 (App.Div. 1997), and that his desire to be buried with his family, coupled with his desire not to be disinterred, was entitled to be enforced notwithstanding the contrary wishes of his surviving spouse. The court therefore denied plaintiff's application, although fashioning alternative relief not germane to the issue before this Court.[1]

Plaintiff appealed, arguing that the trial court erred in its construction of the statutory provisions relating to interment and disinterment. The majority of the appellate panel agreed with her and reversed, concluding that plaintiff should be permitted to disinter the remains and move them to the plot of her choosing. In the majority's view, because decedent had not expressed his intent about the disposition of his remains in a testamentary writing, as required by statute, his preference should not have been considered at all.

The majority's conclusion was based on its view that, although the wishes of a decedent were relevant at common law, *see Sherman v. Sherman*, 330 *N.J.Super.* 638, 649–50, 750 *A.2d* 229 (Ch.Div.1999); *Felipe, supra*, 239 *N.J.Super.* at 87, 570 *A.2d* 1028;

---

[1] In short, the Chancery Division recognized that defendants had agreed to permit plaintiff's remains to be stacked over decedent's when she dies. The court therefore ordered defendants to bear seventy-five percent of the cost of a headstone that would give suitable prominence to plaintiff when she is buried with decedent. Although defendants cross-appealed, contesting the propriety of that relief, because the Appellate Division reversed and ordered disinterment, it did not reach that issue. In pursuing their appeal as of right, *see R.* 2:2 -1(a)(2), defendants did not seek certification on that question, *see R.* 2:12–3, *State v. Breakiron*, 108 *N.J.* 591, 595, 532 *A.2d* 199 (1987), as a result of which their appeal is limited to the question raised in the dissent, *see Gilborges v. Wallace*, 78 *N.J.* 342, 349, 396 *A.2d* 338 (1978).

*Fidelity Union Trust Co. v. Heller,* 16 *N.J.Super.* 285, 290, 84 *A.*2d 485 (Ch.Div.1951), the 2003 enactment of the New Jersey Cemetery Act, *N.J.S.A.* 45:27–1 to –38, made a decedent's preference regarding the disposition of his or her remains binding only if stated expressly in a will, *see N.J.S.A.* 45:27–22(a).

Using that analytical framework, the majority concluded that because decedent had not made his wishes known through a testamentary provision, plaintiff, as his surviving spouse, had the right to decide his burial site and that defendants had violated that statutorily-protected right. The panel then reasoned that the statute governing disinterment, *N.J.S.A.* 45:27–23, although silent about the effect to be given to a decedent's expression of intent, should be read *in pari materia* with the statute governing interment, *N.J.S.A.* 45:27–22. *See generally Skakel v. Twp. of N. Bergen,* 37 *N.J.* 369, 383, 181 *A.*2d 473 (1962) (stating that statutory sections must be read together); *Febbi v. Bd. of Review, Div. of Employment Sec.,* 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961) (same). That analysis led the majority to conclude that in matters relating to disinterment, a spouse's interest should be outweighed only by a testamentary expression of decedent's intent.

The majority then applied a de novo standard of review, *see In re Boyadjian,* 362 *N.J.Super.* 463, 475–76, 828 *A.*2d 946 (App.Div.), *certif. denied,* 178 *N.J.* 250, 837 *A.*2d 1093 (2003), and reversed. In its balancing of the factors, the majority concluded that the trial court had erred in giving primacy to decedent's intent and that a proper balancing would have weighed plaintiff's statutory right, and defendants' actions in depriving her of acting on that right, as sufficient to overcome the general preference against disinterment. The majority therefore directed the Chancery Division to issue an order authorizing plaintiff to disinter decedent's remains and move them to her preferred plot.

Judge Edwin H. Stern dissented, reasoning that the majority erred in using the *in pari materia* analysis. In his view, the two statutory sections should have been read independently of each other, with one, *N.J.S.A.* 45:27–23, governing disinterment exclu-

sively and the other, *N.J.S.A.* 45:27–22, regulating interment. Moreover, as he explained, because the trial court's decision was based on substantial credible evidence in the record and resulted from the proper application of the relevant legal principles and statutory provisions, it was entitled to be affirmed.

Based on the dissent, defendants pursued their appeal to this Court as of right, *see N.J. Const.* art. VI, § 5, ¶ 1(b); *R.* 2:2–1(a)(2). Because the question before the Court is limited to the issue raised in Judge Stern's dissent, we need not recite the arguments made by the parties in the briefs they have filed.

## II.

Although there are some suggestions that at common law the burial of bodies was considered to be a duty devolving on certain persons related to the decedent, *see Toppin v. Moriarty*, 59 *N.J. Eq.* 115, 118–19, 44 *A.* 469 (Ch. 1899) (concluding that surviving spouse is charged with duty of burial, exclusive and superior to right of other kin due to intimacy of spousal relationship); *see also Lascurain v. City of Newark*, 349 *N.J.Super.* 251, 269–70, 793 *A.2d* 731 (App.Div.2002) (recognizing quasi-property right in remains of deceased "limited to the right of burial or other lawful disposition"); *Fidelity Union, supra,* 16 *N.J.Super.* at 290, 84 *A.2d* 485 (referring to right to dispose of decedent's remains as not being testamentary), the subject of burial has been addressed by our Legislature since 1851. *See* Cemetery Act of 1851, *L.* 1851, p. 254.

The earliest statutes relating to burial were designed in large measure to permit the creation of cemetery associations, and, through them, to regulate cemeteries. *See id.* at 254–57. As a result, they referred to interment only in passing. *See id.* at 257–58 (restricting place of burial to cemetery plots in which "a person having at the time of such decease an interest . . . or the relative of some person having such interest, or the wife of such person, or her relative."). The Cemetery Act of 1851, and its several amendments, *see, e.g.,* Cemetery Act of 1883, *L.* 1883, *c.* 135, § 3;

Cemetery Act of 1889, *L.* 1889, *c.* 269, § 3; Cemetery Act of 1890, *L.* 1890, *c.* 68, § 2, which were subsequently codified as Title 8 of the Revised Statutes, *R.S.* 8:1–1 to –22, are of historical interest. However, because they do not shed light on the questions presented by this appeal, we need not address them further.

Our Legislature began to consider whether to revise the statutes relating to cemeteries in the 1950's, largely in response to growing concerns about abuses in cemetery operations. *See* Assembly Committee on Cemeteries and Mausoleums, *Final Report* at 3–4 (Mar. 31, 1952). In 1971, following many years of study and debate, the Legislature repealed all of the earlier statutes and replaced them with an entirely new statutory scheme, codified as Title 8A. The 1971 enactment is significant to the dispute before this Court because it included the predecessors to the current statutes governing interment and disinterment.

As originally enacted, the 1971 interment provision provided as follows:

The right to control the disposition of the remains of a deceased person, unless other directions have been given by the decedent or by a court of competent jurisdiction shall be in the following order:

a. The surviving spouse.

b. A majority of the surviving children of the decedent or the surviving child if one.

c. The surviving parent or parents of the decedent.

d. A majority of the brothers and sisters of the decedent if no child or parent is living.

e. Other next of kin according to the degree of consanguinity.

[*L.* 1971, *c.* 333, § 8A:5–18 (codified at *N.J.S.A.* 8A:5-18) (repealed 2003).]

The interment statute, therefore, created a hierarchy as among survivors for purposes of determining which of them would be authorized to control the disposition of remains. At the same time, however, the statute expressed a preference for carrying out the wishes of the decedent by referring to the right of the decedent to give directions and by authorizing others to act only in the absence of such directions. *Ibid.*

The disinterment statute, also as first enacted in 1971, was markedly different, providing in relevant part as follows:

Remains interred in a lot in a cemetery may be removed therefrom, with the consent of the cemetery company and a written consent of the owners of the lot and of the surviving spouse and children, if of full age. If the consent of any such person or of the cemetery company cannot be obtained, the permission of the New Jersey Cemetery Board shall be sufficient.

[*L.* 1971, *c.* 333, § 8A:5–20 (codified at *N.J.S.A.* 8A:5–20) (repealed 2003).]

That provision, although making no reference to any expressed preference of the decedent, permitted disinterment only if the surviving spouse and children, among others, could agree. *Ibid.* The alternative mechanism, contained in the final quoted sentence, which had vested authority in the Cemetery Board to grant permission in the event that one or more of those individuals did not consent, was deleted by a statutory amendment in 1973. *See L.* 1973, *c.* 219, § 8A:5–20 (codified at *N.J.S.A.* 8A:5–20) (repealed 2003).

Early in 1997, the New Jersey Law Revision Commission began a study of the provisions then codified in Title 8A, concluding in July 1998 that the statute was in need of a significant overhaul. N.J. Law Revision Comm'n, *Final Report Relating to Cemeteries* at 2 (July 1998). Characterizing Title 8A as being neither comprehensive nor consistent, the Commission criticized it for its lack of clarity and organization. *Ibid.* It therefore proposed that substantial changes be made to the statutory scheme in order to remedy the flaws the Commission perceived were in need of correction.

Of significance to the issues before this Court, the Commission proposed three changes to the interment statute. *Id.* at 17 (proposing new provision denominated Cem:5–7). First, it recommended that the language permitting a decedent to give directions concerning interment be altered to make it explicit that such directions would be dispositive. *Id.* comment at 17. In support of that suggestion, the Commission expressed its view that the intention that a decedent's directive would be enforced had always been implicit in the statute, but reasoned that it was appropriate to make it part of the provision's command. *Ibid.*

Second, however, the Commission recommended that, in order to be effective, the decedent's directive would be required to be in the form of a "signed directive" that would specify the disposition or would designate another who would be authorized to decide. *Id.* at 17. In making that recommendation, the Commission recognized that a then-recent appellate court decision had interpreted the existing statute to permit the effectuation of a decedent's directions relating to disposition of remains, although that directive was not in writing. *See id.* comment at 17; *Bruning, supra,* 300 *N.J.Super.* at 429–31, 693 *A.2d* 164 (concluding that neither common law nor 1971 interment statute required decedent's intent to be written in order to be considered). Although acknowledging that its proposal was "more stringent than that of current law," the Commission recommended adoption of the requirement of a writing without further explanation. N.J. Law Revision Comm'n, *supra,* comment at 17.

Third, the Commission suggested that the reference in the 1971 statute to the alternative mechanism of a court order to direct disposition be deleted. *Ibid.* As the Commission explained in its comment, the statute designates the priorities as among the survivors who will be authorized to determine disposition. *Ibid.* That being the case, were the court to issue an order, it would simply be enforcing that statutory hierarchy, making reference to a court order unnecessary. *Ibid.*

Although suggesting no changes to the provision governing disinterment, the Commission recommended the addition of a new section, relating to removal of remains. *Id.* at 18 (proposing new provision denominated Cem:5–8). That section, which is not relevant to the issues before us, required a permit as a precondition to removal of remains, but authorized removal of remains buried on private property for the purpose of reburial in a cemetery. *Ibid.*

The Legislature did not immediately act upon the Commission's recommendations. However, in enacting the Cemetery Act of 2003, now codified at *N.J.S.A.* 45:27–1 to –38, and which is the

statute currently in force, the Legislature was guided in part by the Commission's recommendations.

The 2003 Act, for example, includes the change that the Commission recommended to the interment statute, which would require a written designation by the decedent, but the Legislature's amendment specifically requires that such a designation be included in a will as defined by *N.J.S.A.* 3B:1–2. *See N.J.S.A.* 45:27–22(a). In place of permitting the decedent to make a general directive as to the disposition of the remains, the provision permits the decedent to appoint a person to be authorized to act in his or her place. *Ibid.* Notably, the Act does not limit a decedent's choice of such a person, "permitting someone to be responsible for the disposition of remains outside of the usual lines of next of kin." Senate Commerce Committee, *Statement to Senate Bill No. 1992* (Jun. 12, 2003). Moreover, in spite of the Commission's belief that the reference to a court order would be unnecessary, the current statute retains the authority of a court to vary from the strict hierarchy that the statute would otherwise enforce. *N.J.S.A.* 45:27–22(a).

That is, in pertinent part, the interment statute [2] now provides:

a. If a decedent, in a will as defined in *N.J.S.A.* 3B:1–2, appoints a person to control the funeral and disposition of the human remains, the funeral and disposition shall be in accordance with the instructions of the person so appointed. A person so appointed shall not have to be executor of the will. The funeral and disposition may occur prior to probate of the will. . . If the decedent has not left a will appointing a person to control the funeral and disposition of the remains, the right to control the funeral and disposition of the human remains shall be in the following order, *unless other directions have been given by a court of competent jurisdiction:*

(1) The surviving spouse of the decedent or the surviving domestic partner.

(2) A majority of the surviving adult children of the decedent.

(3) The surviving parent or parents of the decedent.

(4) A majority of the brothers and sisters of the decedent.

---

[2] The interment statute was amended twice in 2005 to include a surviving domestic partner in the language previously designating a surviving spouse as the first among survivors who may be authorized to act. *See L.* 2005, *c.* 324, § 1 (eff. Apr. 13, 2004); *L.* 2005, *c.* 331, § 29 (eff. Jan. 12, 2006).

(5) Other next of kin of the decedent according to the degree of consanguinity.

(6) If there are no known living relatives, a cemetery may rely on the written authorization of any other person acting on behalf of the decedent.

[*Ibid.* (emphasis added)]

Although the Commission had not suggested that any changes be made to the terse language of the disinterment statute, as part of the Cemetery Act of 2003, the Legislature added a new provision governing disinterment. *N.J.S.A.* 45:27–23. In part, the provision is a compilation of earlier sections of the statutory scheme, along with the recommendations of the Commission that a new section relating to removal of remains under certain circumstances be added. On its face, however, in enacting the disinterment provision of the 2003 statute, the Legislature created a hierarchy for decision-making in disinterment that is fundamentally different from the one that governs interment.

The 2003 statute relating to disinterment provides in pertinent part as follows:

a. Except as otherwise provided in this section, or pursuant to court order, human remains shall not be removed from an interment space unless:

(1) the surviving spouse, adult children and the owner of the interment space authorize removal in writing;

(2) removal is authorized by a State disinterment permit issued by the local board of health; and

(3) the cemetery finds that removal is feasible.

[*Ibid.*]

The language of the provision demonstrates several clear differences between this statute and the one governing interment. First, there is a strong preference that remains, once interred, "shall not be removed." *Ibid.* Second, the authority to disinter is not vested in the surviving spouse alone, but rather is given to the "surviving spouse, adult children and the owner of the interment space," who must give their authorization both jointly and in writing. *Ibid.* Third, the power of the court to act in a manner contrary to the statute is expressly preserved. *Ibid.*

With this explanation of the historical underpinnings to serve as our background, we turn to a consideration of the meaning and

intent of the governing statutory language and its application to the dispute before us.

## III.

The role of the Court in statutory interpretation "is to determine and effectuate the Legislature's intent." *Bosland v. Warnock Dodge, Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009). As we have explained, in performing this task, "we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008). In doing so, we begin by reading the words chosen by the Legislature in accordance with their ordinary meaning, *Bosland, supra,* 197 *N.J.* at 553, 964 *A.*2d 741, unless the Legislature has used technical terms, or terms of art, which are construed "in accordance with those meanings," *In re Lead Paint Litig.,* 191 *N.J.* 405, 430, 924 *A.*2d 484 (2007); *see N.J.S.A.* 1:1-1 ("[W]ords ... having a special or accepted meaning in the law, shall be construed in accordance with such ... meaning."). We will not "rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language." *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002).

We have often noted that, if the plain language of a statute is not clear or if it is susceptible to more than one possible meaning or interpretation, courts may look to extrinsic secondary sources to serve as their guide, *see, e.g., Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565–66, 924 *A.*2d 1193 (2007) (referring to legislative history); *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.*2d 454 (1994) (considering Governor's press release); *Panzino v. Cont'l Can Co.,* 71 *N.J.* 298, 301–03, 364 *A.*2d 1043 (1976) (relying on statements of sponsors of enacted bills), but we do not resort to such tools unless needed.

In addition to using these extrinsic sources to assist in discerning legislative intent, there are a variety of rules of statutory

construction that may be useful, one of which we are called upon to consider in this appeal. The lynchpin of the analysis used by the majority of the appellate panel was its application of the maxim of statutory construction that calls for interpreting sections of a statute passed at the same time or included within the same Act by reading them *in pari materia*.

 "Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." 2B *Sutherland on Statutory Construction* § 51:3 (7th ed. 2008) (footnotes omitted); *accord State v. Crawley*, 187 *N.J.* 440, 453, 901 *A.2d* 924 (2006). As this Court has explained:

> Statutes that deal with the same matter or subject should be read *in pari materia* and construed together as a "unitary and harmonious whole." This maxim of statutory construction is especially pertinent when, as in this case, the statutes in question were passed in the same session.
>
> [*St. Peter's Univ. Hosp. v. Lacy*, 185 *N.J.* 1, 14–15, 878 *A.2d* 829 (2005) (citation omitted).]

Resort to this maxim, like other tools used by courts to assist them in divining legislative intent, is helpful when the Legislature's intent is unclear. That is, "[s]tatutes *in pari materia* are to be construed together when helpful in resolving doubts or uncertainties and the ascertainment of legislative intent." *In re Return of Weapons to J.W.D.*, 149 *N.J.* 108, 115, 693 *A.2d* 92 (1997); *see Febbi, supra*, 35 *N.J.* at 606, 174 *A.2d* 481 (stating that Legislature's intent is to be derived from considering entire statute and reading all sections together as a unified whole).

 However, before undertaking an *in pari materia* analysis to discern legislative intent, the court must first decide whether the two statutes in question actually "concern the same object." 2B *Sutherland, supra*, § 51:3. Considerations such as whether both statutes were included in one enactment, whether the proofs required overlap, and whether they are "designed to serve the same purpose and objective," are particularly relevant to this question. *Ibid.*; *see Mimkon v. Ford*, 66 *N.J.* 426, 433, 332 *A.2d* 199 (1975) (stating that statutes *in pari materia* should seek same

overall legislative purpose). As we long ago cautioned, however, "[t]he adventitious occurrence of like or similar phrases, or even of similar subject matter, in laws enacted for wholly different ends will normally not justify applying the rule" of *in pari materia* construction. *State v. DiCarlo*, 67 *N.J.* 321, 325, 338 *A.2d* 809 (1975); *see Richard's Auto City v. Dir., Div. of Taxation*, 140 *N.J.* 523, 541, 659 *A.2d* 1360 (1995) (stating that acts with clearly distinct purposes are not to be read *in pari materia* ).

The statutes at issue in this matter well illustrate the pitfalls of over-reliance on maxims of statutory construction, because the language used in each of the sections, the selection of different words, and the Legislature's expression of a different preference in one section than in the other makes plain that they are not designed to serve a common purpose. More to the point, as this appeal demonstrates, there is a danger that in attempting to learn the Legislature's intent by applying this maxim of statutory construction, the court might instead inappropriately import concepts from one statutory provision into a separate provision with a different objective or intent. That is, in the effort to make statutes harmonious, the court must avoid straining to make consistent statutes as to which the Legislature's choice of words makes evident its contrary intent.

█ Our review of the interment and disinterment statutes leads us to conclude that the majority of the appellate panel did just that, adding concepts from the former into the latter, when the words themselves make clear that those concepts were not intended to be there. In attempting to find harmony, the majority of the panel overlooked the obvious intention of the Legislature to approach interment and disinterment differently, with the result that it substituted its view of what would be a consistent scheme for the entirely rational choice of the Legislature to view the circumstances attendant upon disinterment differently from those that are relevant to interment.

That there are differences between interment and disinterment, both as a practical matter and in the statutory scheme designed

by the Legislature, is obvious. To begin with, when someone dies, the need for a clear demarcation between who may decide on burial and the order of preference to be given to those who might otherwise have a voice in the matter is paramount. The corollary need for an efficient mechanism to avoid, or to end quickly, disputes among those who might disagree is of almost equal significance.

The Legislature's amendment to the statute in 2003 makes particularly clear its intention to afford little room for dispute about interment in the first instance. Although embracing the notion that a decedent desiring to decide the disposition of his or her remains is entitled to have that expression of intent effectuated, the Legislature limited the means of doing so in a clear effort to prevent both disputes and delays. By requiring that the directions be in writing and by requiring that the writing be in a will, rather than adopting the recommendation of the Commission that would have made any form of writing acceptable, the Legislature greatly reduced the possibility that burial would be delayed while survivors battled over the decedent's preferences.

That is not to say that the statute can never give rise to a dispute, the effect of which will be to delay the interment of a decedent's remains. Survivors may disagree by proffering more than one document as an individual's last will and testament, the validity of which might not be immediately apparent. Moreover, in spite of the Legislature's effort to create a clear hierarchy to be followed in the absence of a directive in a will, disputes might arise if, for example, there is no surviving spouse and no majority among the surviving adult children who agree. The Legislature's rejection of the Commission's recommended deletion of the language relating to court orders demonstrates its recognition that the court is empowered to, and may, act to resolve disputes.

By the same token, however, the considerations about avoiding delay or creating clear designations of decision-making authority are not germane to disinterment and therefore are largely absent from the disinterment statute. The need for a quick and expedi-

ent method to identify who is authorized to act vanishes once remains have been buried. The effort to create, as in the interment statute, a scheme of priorities so clear and plain that it will rarely lead to a dispute requiring intervention by the courts plays no role in a dispute arising over disinterment. That the Legislature designed these statutes to be read in accordance with their plain terms could not be more apparent.

Evidence of the Legislature's intent that the disinterment statute be read as a separate mechanism can be found in its plain language, in the legislative history, and in its common sense application. First, the express presumption of the disinterment statute is that remains, once interred, shall not be removed. By limiting disinterment to the specific circumstances set forth in the statute or by court order, the preference of the Legislature is further emphasized. Second, comparing the two prioritization schemes, the disinterment statute erases the primacy that the interment statute affords to the surviving spouse. That decision to empower a single voice with authority, in the absence of a directive contained in a will, is replaced in the disinterment statute with the requirement that the spouse and all of the surviving adult children, not merely a majority of the adult children, jointly concur. Third, the practical effect of the statute is to limit, rather than expand, the practice of disinterment, in effect to embrace a general agreement that the dead should rest undisturbed, by making it more difficult to demand disinterment or to achieve it.

## IV.

■ The differences between these two statutes are clear; the Legislature's intent is equally clear. Viewed in light of those differences, the question before this Court is what role, if any, a decedent's intent should play when a court is called upon to decide a dispute about disinterment. Our answer to that question must begin with a comparative evaluation of the approaches used by the Chancery Division and the appellate panel's majority.

The Chancery Division made only two factual findings that bear on the question before us. First, the court found that plaintiff did not willingly agree to the decision to bury decedent in his family's plot, but that her will was overborne by defendants. Second, the court found that decedent's preference was that he be buried with his family and, having been buried, that his remains not be disturbed. Because those findings are supported by sufficient credible evidence in the record, they are entitled to deference from all appellate courts. *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). To those findings we add another fact that the appellate panel's majority found to be critical, and which is undisputed in the record. Plaintiff, as the surviving spouse, wanted decedent buried in the plot near her family rather than where he was buried.

In evaluating those facts against the disinterment statute, the Chancery Division concluded that decedent's wishes were paramount and entitled to be enforced, regardless of plaintiff's contrary desires and regardless of whether her acquiescence to the original burial was given under duress. The Appellate Division's majority, which was not obligated to defer to that legal analysis, *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995), disagreed with that conclusion. Instead, the majority of the panel read two factors into the disinterment statute through its statutory construction analysis. First, the panel concluded that decedent's preference, because it was not contained in a testamentary writing, was not entitled to be considered. Second, it reasoned that because plaintiff, as the surviving spouse, was deprived of the right to make the interment decision in the first instance, vindication of her right required that her desire prevail in the disinterment dispute.

We are not persuaded by the Appellate Division majority's reasoning or its interpretation of the statutes. The language of the statute, *see N.J.S.A.* 45:27–23, expresses a legislative preference against disinterment. Even were that not so, the disinterment statute makes it plain that the surviving spouse's desire is

not paramount. In fact, her status in the statutory decision-making hierarchy is reduced, from a position of having the primary authority to inter, to one of sharing authority to disinter equally with all surviving adult children.

Moreover, we are confident that the absence of language in the disinterment statute concerning the court's consideration of the decedent's preference is not evidence that the Legislature intended that the requirement of a writing that it added to the interment statute would apply. On the contrary, the very different circumstances of disinterment, the preference that the practice be limited, the alteration in the statutory decision-making scheme, and the inherent power of the court to do equity all militate in favor of permitting consideration of the decedent's wishes, however expressed.

In large part, the majority of the appellate panel viewed the matter as one in which plaintiff was wrongfully deprived of her statutory right to have decided the place of interment in the first instance. Seen in that light, the panel concluded that she was entitled to disinterment as a remedy for that injustice. Likewise, our dissenting colleague reasons that the original interment was wrongful and that equity demands that it be undone. We, however, disagree. To begin with, the factual record does not suggest that defendants intentionally or knowingly deceived plaintiff concerning who was authorized to act. The undisputed evidence is that one of the co-executors sought, and received, advice from an attorney about their rights. Although that advice was incorrect, it was their mistaken belief and their unanimous view of their late father's strongly expressed desires, rather than any evil animus, that motivated them to act.

Even if that were not the case, nothing in the disinterment statute suggests that it is intended to be used as a remedy, even for one who was deprived of the right to inter in the first place. Instead, to the extent that the Legislature made any provision for relief in such circumstances, it is expressed in the interment statute's provision making a civil remedy available against one

who wrongfully effects interment. *See N.J.S.A.* 45:27–22(d) (deeming that one who "signs an authorization for the . . . disposition of human remains" warrants truth of facts asserted; authorizing claim sounding in breach of warranty or false statement). Whether that remedy would have been or would now be available to plaintiff is not before this Court, and we therefore do not address it further.

In considering the equities of the matter, the Chancery Division recognized that the disinterment statute includes no yardstick for the court to apply to the dispute between plaintiff and decedent's surviving children. In exercising its equitable powers, the Chancery Division was entitled to strike the balance in favor of giving voice to decedent's clear preference. Although in doing so the court inappropriately expressed its view that decedent's wishes should be of "paramount" importance, the correctness of the court's conclusion is not thereby diminished. That is to say, when viewed in accordance with the disinterment statute, the court was entitled to weigh the views of decedent along with those of all of the survivors.

In the circumstances presented in this record, we need not consider whether the Chancery Division's expression of its belief that decedent's preference alone was entitled to be accorded "paramount" importance invalidates its legal conclusion. The record is undisputed that the preference about burial attributed to decedent was not his alone; rather it was also the preference of all of the surviving adult children, who spoke with a unified voice. Seen in that context, plaintiff's contrary preference was insufficient as a matter of law.

## V.

The judgment of the Appellate Division is reversed.

Justice RIVERA–SOTO, dissenting.

If this case involved a proper initial interment of a body, followed by a request for disinterment, I would be in full accord

with the majority's analysis and conclusions. It does not. Rather, this case represents the ratification of a result wrongfully obtained. By an appeal as of right resulting from a dissent in the Appellate Division, *N.J. Const.* art. VI, § V, ¶ 1(b); *R.* 2:2–1(a)(2), we are called on to review such condemnable behavior. Viewing this case narrowly, the majority endorses and rewards that behavior. That I cannot do.

Because plaintiff never validly waived her statutory rights and the original internment here was procured either by fraud or mutual mistake in violation of clear and unambiguous legislative dictates, the majority's reasoning, albeit correct, is irrelevant. Further, the result reached by the majority rewards a wrongdoer, a result that runs counter to this Court's lengthy equitable traditions and, more importantly, its fundamental obligations. For those reasons, and substantially for the reasons so clearly and convincingly presented in the opinion by Judge Miniman on behalf of a majority of the Appellate Division panel, I respectfully dissent.

## I.

Plaintiff Joan Marino and the decedent, Larry L. Marino, Sr., were married for over twenty-three years. During that time, plaintiff raised Larry Sr.'s two sons from a prior marriage, Larry Jr. and Brett, as if they were her own; plaintiff and decedent also had four children of their own, Jennifer, John, Daniel, and Nicholas. Larry Sr., then age forty-nine, died at home on October 23, 2005. At the time of Larry Sr.'s death, all of the children save for Nicholas were adults.

Several years earlier, plaintiff and decedent had purchased cemetery plots where plaintiff and decedent planned to be buried. Those plots were in the same cemetery where both plaintiff's family and decedent's family had their own plots; plaintiff's and decedent's personal plots were purchased through plaintiff's mother and were located somewhat closer to plaintiff's family's plot. Shortly after Larry Sr.'s death, and although Larry Sr.'s Will

made no mention of the disposition of his remains, the children unilaterally determined that their father should be buried in his parents' plot, where there would be no room for plaintiff when she died. Despite plaintiff's emotional entreaties, the children claimed they had voted to bury their father in the paternal plot; the only accommodation they offered plaintiff was that their father's grave would be dug deeper so that plaintiff could be buried "stacked" on decedent's coffin. According to plaintiff, she acquiesced in this arrangement under duress: she was told bluntly that Larry Jr. and Jennifer were the named executors of decedent's estate; that the decision of where to bury Larry Sr. was reserved to the executors; and that if she failed to consent to the children's plans, plaintiff would be barred from her husband's viewing, services, and burial. Some time later, plaintiff brought an action in Chancery to vindicate her statutory right to determine where her husband was to be buried, a right that was denied to her by the children and the Chancery court, reinstated to her by the Appellate Division, but again stripped from her by this Court.

## II.

### A.

The law governing those facts is straightforward. The citizens of this state, speaking through the Legislature, have decreed that when, as here,

the decedent has not left a will appointing a person to control the funeral and disposition of the remains, the right to control the funeral and disposition of the human remains shall be in the following order, unless other directions have been given by a court of competent jurisdiction:

(1) The surviving spouse of the decedent or the surviving domestic partner.

(2) A majority of the surviving adult children of the decedent.

(3) The surviving parent or parents of the decedent.

(4) A majority of the brothers and sisters of the decedent.

(5) Other next of kin of the decedent according to the degree of consanguinity.

(6) If there are no known living relatives, a cemetery may rely on the written authorization of any other person acting on behalf of the decedent.

[*N.J.S.A.* 45:27-22(a).]

In this clear and unambiguous passage, New Jerseyans have made the judgment that if a decedent does not set forth in his Will where and how to dispose of his remains, that decision falls, in order, on those persons the Legislature has specified. First and primary among those is the surviving spouse. In sum, then, if a decedent fails to make a testamentary disposition of his remains and his surviving spouse decides where and how those remains are to be handled, that decision is both uniquely that of the surviving spouse and, more to the point, final.

That is not what happened here. According to plaintiff, she was informed by Larry Jr. that he and his half-sister Jennifer were the designated executors of the decedent's estate and that, therefore, where and how decedent was to be buried was their decision, and theirs alone. Plaintiff also testified that, although she piteously pleaded that decedent be buried in the plot she and decedent had purchased for precisely that purpose, she acquiesced in allowing decedent to be buried in his family's plot only under duress, as she was threatened that she would be excluded from her husband's viewing, services, and burial. Even according to Larry Jr., the decision to bury his father in his parents' family plot was one reached by a vote of the children, completely disregarding the wishes of his father's widow who, tellingly, also was the woman who raised him from age five as if he were her own child.

### B.

In those circumstances, any claim that plaintiff purportedly waived her sole and exclusive statutory right to make the interment decision concerning her husband is unworthy of credence. All witnesses agreed that plaintiff consistently maintained that she wanted to bury her husband in the plot they had purchased together, and that she grudgingly conceded to the burial arrangements foisted on her by the executors' wrongful claim of right. In that stark context, it cannot be said that plaintiff waived the right exclusively granted to her by *N.J.S.A.* 45:27–22(a). We have made clear, time and time again, that

"[w]aiver is the voluntary and intentional relinquishment of a known right." *Knorr v. Smeal*, 178 *N.J.* 169, 177 [836 *A.2d* 794] (2003) (citing *W. Jersey Title & Guar. Co. v. Indus. Trust Co.*, 27 *N.J.* 144, 152 [141 *A.2d* 782] (1958)). *See also Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 *N.J.* 72, 89 [948 *A.2d* 600] (2008). It is beyond question that "[a]n effective waiver requires a party to have full knowledge of his legal rights and inten[d] to surrender those rights." *Knorr, supra*, 178 *N.J.* at 177 [836 *A.2d* 794] (citing *W. Jersey Title & Guar. Co., supra*, 27 *N.J.* at 153 [141 *A.2d* 782] ). A waiver cannot be divined but, instead, must be the product of objective proofs: "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." *Ibid.* (citing *Merchs. Indem. Corp. of N.Y. v. Eggleston*, 68 *N.J.Super.* 235, 254 [172 *A.2d* 206] (App.Div.1961), *aff'd*, 37 *N.J.* 114 [179 *A.2d* 505] (1962)). That benchmark standard leaves little room for doubt, as "[t]he party waiving a known right must do so clearly, unequivocally, and decisively." *Ibid.* (citing *Country Chevrolet, Inc. v. Twp. of N. Brunswick Planning Bd.*, 190 *N.J.Super.* 376, 380 [463 *A.2d* 960] (App.Div.1983)). *See also Shotmeyer, supra*, 195 *N.J.* at 89 [948 *A.2d* 600] (quoting *Knorr, supra* ). Specifically, "waiver 'presupposes a full knowledge of the right and an intentional surrender; waiver cannot be predicated on consent given under a mistake of fact.' " *County of Morris v. Fauver*, 153 *N.J.* 80, 104-05 [707 *A.2d* 958] (1998) (quoting *W. Jersey Title & Guar. Co., supra*, 27 *N.J.* at 153 [141 *A.2d* 782] ).

[*Sroczynski v. Milek*, 197 *N.J.* 36, 63-64, 961 *A.2d* 704 (2008) (Rivera-Soto, J., concurring in part and dissenting in part).]

That there was nothing voluntary or intentional in plaintiff's abdication to the burial demands made by the executors or the children is self-evident. Moreover, it also remains beyond question that plaintiff simply did not know that it was her sole, exclusive, and statutory right to demand where and how her husband was to be buried so that, even if her acts were voluntary and intentional, they certainly were not in respect of a *known* right. Taken either separately or in the aggregate, one and only one conclusion takes form: these facts do not even begin to scratch the surface of what is needed in order to constitute a valid waiver.

## C.

Even if it could be said that plaintiff somehow waived her statutory right to designate the disposition of her husband's remains, it is also clear that any such waiver was procured by fraud. We have long held the view that "[e]very fraud in its most general and fundamental conception consists of the obtaining of an

undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624, 432 *A.2d* 521 (1981) (citation omitted). We have differentiated between legal and equitable fraud, noting that "[d]epending on the remedy sought, an action for fraud may be either legal or equitable in nature." *Ibid.* (citations omitted). We also have noted that "fraud may be either actual or constructive" and that "[t]he distinguishing factor is the element of untruth between the parties required in the former but not in the latter." *Ibid.* (citation omitted).

The differences between legal and equitable fraud have been highlighted as follows:

> A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud. Thus, whatever would be fraudulent at law will be so in equity; but the equitable doctrine goes farther and includes instances of fraudulent misrepresentations which do not exist in the law.
>
> [*Id.* at 624-25, 432 *A.2d* 521 (citations, internal quotation marks, and editing marks omitted).]

A cause of action in fraud "requires the satisfaction of five elements: a material misrepresentation by the defendant of a presently existing fact or past fact; knowledge or belief by the defendant of its falsity; an intent that the plaintiff rely on the statement; reasonable reliance by the plaintiff; and resulting damages to the plaintiff." *Liberty Mut. Ins. Co. v. Land,* 186 *N.J.* 163, 175, 892 *A.2d* 1240 (2006). *See generally Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 610, 691 *A.2d* 350 (1997) (same). Finally, if "[p]laintiff seeks only equitable remedies[, she] therefore need meet only the lesser burden of proving equitable fraud[ and, c]onsequently, scienter is not at issue." *Jewish Ctr. of Sussex County, supra,* 86 *N.J.* at 625, 432 *A.2d* 521 (citation omitted).

An even-handed application of those principles to the circumstances presented here yields a textbook example of equitable

fraud: the executors and children materially misrepresented that they and they alone had the authority to determine the disposition of their father's remains; in so doing, they intended that plaintiff rely upon that misrepresentation; plaintiff reasonably relied on that misrepresentation; and, because plaintiff was denied the right to bury her husband in the plot they had purchased for that purpose, plaintiff was damaged. Furthermore, defendants cannot claim that their mother should have known better than to rely on their representations and, instead, should have sought her own counsel. Placing aside the utterly reprehensible notion that a grieving widow somehow is required affirmatively to rebut the authoritarian demands of her children by prancing off to consult with a lawyer in that painfully narrow window of time during which burial plans are made, our law is clear: "One who engages in fraud, however, may not urge that one's victim should have been more circumspect or astute." *Id.* at 626 n. 1, 432 *A.*2d 521 (citation omitted).

Because plaintiff's acquiescence to the executors' and children's burial plans was the product of equitable fraud, decedent's initial interment was of no legal effect. Hence, the statutory requirements for disinterment found in *N.J.S.A.* 45:27–23 are not triggered.

### D.

Even if it could be said that plaintiff somehow waived her statutory right to designate the disposition of her husband's remains, and even if it could be said that plaintiff's acquiescence in decedent's burial arrangements was not procured by fraud, there can be no doubt that plaintiff's consent to decedent's burial was the product of a mutual mistake that renders that consent inoperative.

Viewing the proofs in the light most favorable to defendants, Larry Jr. testified that, when he discussed where decedent was to be buried with plaintiff, she "was visibly upset [because] she, in fact, wanted … my father buried in the plots that her mother had

purchased for them[.]" He noted that he "went to [his] siblings and explained to them that [their father could be buried in his parents' plot and not where his widow/their mother wished], and I wanted them to decide on where ... my father was going to be buried." He acknowledged that "[a]t that time [plaintiff] became upset again. She was looking for any alternative to make this not happen." Larry Jr. also testified that he consulted with a lawyer before decedent's funeral and that, according to that lawyer's opinion, Larry Jr., as executor, had the authority to decide decedent's funeral arrangements. That statement triggered the following question and answer:

Q. Is it accurate to say that as a result of whatever [that lawyer] told you, you assumed responsibility for and control of the disposition of your father's remains?

A. Yes, sir.[1]

Clearly, then, Larry Jr., at the very least, was operating under the impression that he, as executor of his father's estate, was the one who possessed the right and power to determine the disposition of his father's remains. Also, he communicated that conclusion to plaintiff, whose reliance on that assertion is made all the more reasonable by the fact that it was made by the son she had raised as one of her own children since he was age five and who, as a grown man, was a police officer in the same municipality in which her husband had been chief of police.

Viewing those facts in their most charitable light, both plaintiff and defendants were laboring under a mutual mistake, that is, " 'both parties were laboring under the same misapprehension as to a particular, essential fact.' " *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 608, 560 *A.2d* 655 (1989) (quoting *Beachcomber Coins, Inc. v. Boskett,* 166 *N.J.Super.* 442, 446, 400 *A.2d* 78 (App.Div.1979)). And, " '[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected

---

[1] Nothing in this dissent should be construed to intimate whether a viable cause of action exists against that lawyer for such patently erroneous advice.

party[.]' " *Ibid.* (quoting *Restatement (Second) of Contracts* § 152(1) (1981)). At its core, the doctrine of mutual mistake requires that "the parties must *share* this erroneous assumption." *Ibid.* (emphasis supplied). Because the presence of a mutual mistake means that there has been no meeting of the minds sufficient to warrant that the parties be bound thereby, neither plaintiff nor defendants should be bound by that to which no properly informed party could have agreed. *See Parrette v. Citizens' Cas. Co.,* 128 *N.J. Eq.* 206, 209, 15 *A.*2d 802 (E. & A.1940) (holding that "mutual mistake is ground for reformation when, as here, the minds of the parties have met contractually but because of a mutual mistake the written contract between the parties is wanting in expression or execution to evince the actual and binding contractual intent of the parties").

### E.

No matter how gauged, the actions of the executors and the children were wrongful: *N.J.S.A.* 45:27–22(a) clearly and without reservation places the exclusive right to determine the disposition of decedent's remains solely in plaintiff's hands. In the end, it matters little that plaintiff never voluntarily and intentionally waived a known right; it matters little that decedent's initial interment was procured by equitable fraud; and, it matters little that decedent's initial interment was the result of a mutual mistake. The inescapable net consequence is that, unless the wrongfully procured initial interment of decedent is voided and the parties returned to the position they should have been in by law, defendants—the only wrongdoers here—will enjoy this Court's imprimatur on their foul deeds.

That result is entirely contrary to this Court's proud and consistent traditions. One must not lose sight of the fact that this action was brought in Chancery, seeking only equitable relief. Thus, traditional maxims fully applicable to actions at law are to be, in large measure, relaxed in order to achieve equity, and equitable defenses otherwise irrelevant to actions at law acquire

vitality. More to the point, decisions in equity are controlled by the doctrine of "unclean hands." We have explained that "[t]he essence of that doctrine, which is discretionary on the part of the court, is that a suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings." *Borough of Princeton v. Bd. of Chosen Freeholders of Mercer County*, 169 N.J. 135, 158, 777 A.2d 19 (2001) (citations, internal quotation marks, and editing marks omitted). "'In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit.'" *Ibid.* (quoting *Faustin v. Lewis*, 85 N.J. 507, 511, 427 A.2d 1105 (1981)). Where, as here, the matter in controversy between the parties was procured by wrongdoing—be it intentional or inadvertent—it ill-becomes this Court to ratify that result by the strict application of legal principles without also applying the "play in the joints" equity jurisprudence needs and demands. Also, we have explained that "[a] basic equitable maxim is that 'he who seeks equity must do equity.'" *Thompson v. City of Atlantic City*, 190 N.J. 359, 384, 921 A.2d 427 (2007) (quoting *Ryan v. Motor Credit Co.*, 132 N.J. Eq. 398, 401, 28 A.2d 181 (E. & A.1942)). Although defendants violated both of these fundamental equitable requirements, they are being permitted to do so with impunity.

Even in a legal setting involving so mundane a topic as a commercial lease, we have made clear that, although "[w]e are not eager to impose a set of morals on the marketplace[,] there are ethical norms that apply even to the harsh and sometimes cut-throat world of commercial transactions." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 230, 864 A.2d 387 (2005) (citation omitted). We have noted that "[g]amesmanship can be taken too far, as in this case." *Ibid.* It is, to say the least, perplexing that the stiff backbone this Court exhibited on behalf of a garden-variety commercial tenant in an action at law is unaccountably absent in an action in equity brought by a grieving widow who was misled, if not defrauded, in her deepest moment of sorrow by the children she lovingly raised

and who, more importantly, possessed clear, unmistakable rights provided by the Legislature, rights that have been cruelly cast aside.

### F.

Finally, this analysis must be tethered to the New Jersey Cemetery Act, 2003 (Cemetery Act), *N.J.S.A.* 45:27–1 to –38. As the Appellate Division correctly noted, the Cemetery Act "make[s] the decedent's decision regarding who shall make funeral arrangements binding, *provided that the decision is in writing.*" (citing *S. Doc. No.* 1992 (2003))(emphasis supplied). As the panel made clear, "under the Cemetery Act, orally expressed preferences are no longer binding and the surviving spouse may select a burial site inconsistent with those preferences." It aptly concluded that "[t]he adult children violated this statute and deprived the surviving spouse of the right to determine the disposition of the remains of her husband of twenty-three years[,]" and that, "[i]nstead, the children decided to bury their father in a plot owned by the paternal grandmother where plaintiff wife had no right of burial." It further noted that "[t]he Chancery judge found that this statute was violated." It explained, however, that the Chancery judge incorrectly "analyzed the request to disinter and relocate the body to another plot in the cemetery under *N.J.S.A.* 45:27–23 without consideration of the potential impact of *N.J.S.A.* 45:27–22 on the factors bearing upon disinterment." Because the disinterment statute—*N.J.S.A.* 45:27–23—"does not prohibit disinterments that are inconsistent with even a binding preference expressed in a will[,]" the panel reasoned that "[t]he issue thus becomes whether an orally expressed preference can control the disinterment and essentially trump all of the factors favoring removal when it cannot control the interment."

It noted that "[a] court of equity is fully authorized to discharge the maxims that sustain our equity jurisprudence. Chief among these maxims is that which states wherever a legal right has been infringed a remedy will be given or, as more commonly stated,

equity will not suffer a wrong without a remedy." (quoting *In re Mossavi*, 334 *N.J.Super.* 112, 121, 756 *A.2d* 1076 (Ch.Div.2000) (internal quotation marks omitted)). It highlighted that the Chancery judge did not "acknowledge that [plaintiff] had 'the primary and paramount right to the possession of the body and the right to control its burial and other disposition.'" (quoting *Felipe v. Vega*, 239 *N.J.Super.* 81, 85, 570 *A.2d* 1028 (Ch.Div.1989)). The panel commented that, in this statutory structure, "[t]he decision to disinter involves a balancing of the factors favoring disinterment against those that do not and we review a fundamental error in balancing the facts de novo." (citing *In re Application of Boyadjian*, 362 *N.J.Super.* 463, 475, 828 *A.2d* 946 (App.Div.), *certif. denied*, 178 *N.J.* 250, 837 *A.2d* 1093 (2003)). It concluded:

Here the judge did not engage in a balancing analysis of all of the relevant factors, instead treating the decedent's oral preference as determinative. Even if the defense witnesses were totally credible, the decedent's orally expressed preference does not outweigh all the other factors that strongly favor disinterment. That preference is even weaker coming from the mouths of witnesses who were not generally credible, as the judge found here. Under a proper balancing analysis plaintiff has clearly established good cause for removal that overcomes the presumption of nonremoval.

The Appellate Division's reasoning and conclusions are unassailable. Therefore, its judgment should be affirmed.

### III.

Because plaintiff never validly waived her statutory rights; because the original internment here was procured either by fraud or mutual mistake in violation of clear and unambiguous legislative dictates; because the result reached by the majority contravenes settled principles of equity jurisprudence and inexplicably rewards a wrongdoer; and substantially for the reasons thoughtfully presented by Judge Miniman on behalf of a majority of the Appellate Division panel, I respectfully dissent.

*For reversal*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For affirmance*—Justice RIVERA–SOTO—1.